MONTIEL, Judge.
The appellant was convicted of murder, in violation of § 13A-6-2, Code of Alabama 1975, as charged in the indictment. He was sentenced to 60 years’ imprisonment.
On March 7, 1991, two officers with the Huntsville Police Department, Jack Pugh and Andy Jackson, were patrolling the area around a local housing project. During their patrol, Officers Pugh and Jackson observed three black males approach a truck. The State’s evidence tended to show that the officers heard a gunshot and saw the black men run from the truck. When Pugh and Jackson arrived at the truck they found a white male in the driver’s seat. The man had suffered a gunshot wound in the chest. The victim died as a result of the gunshot wound.
The State’s evidence tended to show as follows: The appellant had sold the victim a few “rocks” of cocaine on the night before the shooting and the victim did not pay him. On March 7, 1991, the appellant, with a pistol in his hand, approached the victim’s truck intending to be paid. An argument between the appellant and the victim ensued and, after a struggle, the victim was shot.
*1208 Following the shooting, the police officers secured the scene to search for evidence. Shortly afterwards, one of the young men, Zackery Miller, returned to the scene and was immediately placed in custody. Eventually, the other two black men, including the appellant, turned themselves in.
The appellant testified in his own behalf and admitted that he had borrowed the pistol that was used to shoot the victim. However, the appellant claimed that he meant only to scare the victim and that the pistol went off only after the victim attempted to grab it.
The appellant contends that the trial court was in error when it prohibited his witness from freely testifying and thus he was denied his right to a fair and impartial trial. Specifically, the appellant argues that the Madison County District Attorney and the trial court intentionally prevented his key witness from testifying by informing the witness of his Fifth Amendment right regarding self-incrimination.
At trial, the appellant called Zackery Miller as a witness. Miller, one of the black men who had approached the victim’s truck, had been a witness at the scene of the shooting. There was evidence that he had flagged down the victim’s truck and that he was at the truck window and had handéd the gun to the appellant. After Zackery Miller was called to testify, the following exchange took place outside the presence of the jury:
“MR. LAMPLEY: [Defense Counsel] We’ll call Zack Miller, your Honor.
“THE COURT: Do any of you jurors need a recess, or can we go on?
“MR. LAMPLEY: Your Honor, may we approach, please?.
“THE COURT: Yes, sir.
“(The attorneys approached the bench and the following occurred out of the hearing of the jury:)
“MR. LAMPLEY: Your Honor, in order not to put Mr. Miller in a position of having to invoke any right warnings, I only intend to ask him what he saw and observed there at the truck. I do not intend to ask him any questions about what happened to the handgun, where it went, did he ever handle it or control it, only what he saw at the truck. I think if we go into his handling of the gun or anything it'may invoke some right of his.
“THE COURT: As soon as he goes on the stand, he’s under oath. He’s subject to any — What are you all saying to me?
“MR. LAMPLEY: That I intend only to ask him what he saw.
“THE COURT: Well, you ask him what you’re going to ask him.
“MR. LAMPLEY: This was the same precaution that the State had brought to the Court’s attention earlier.
“THE COURT: It was my understanding it was about John Brooks.
“MR. LAMPLEY: Zack Miller, your Honor.
“MR. BROOKS: [Prosecutor] No, this is the individual I was referring to.
“THE COURT: Well, what is the State’s position on that?
“MR. BROOKS: Pardon me?
“THE COURT: What is the State saying to me?
“MR. BROOKS: He was the one I warned you about earlier on who may say something that would self-incriminate himself because he was at the window, the one that flagged down the truck, he was the one who handed the gun to Felton Matthews.
[[Image here]]
“THE COURT: Now, remind me again. At the beginning of this trial, you stated that he might be considered an accomplice?
“MR. BROOKS: Your Honor, at this point, he is not considered a co-defendant or an accomplice. He’s not been arrested for this. The concern I expressed was, well, what he might say might change things. I don’t know of anything that he *1209 would say that would change things. I just wanted to put the Court on notice so that if the question popped up and he started answering a certain way, you could cut him off or his attorney could if he had one appointed to represent him during these proceedings.
“But at this point, he is not considered a suspect or an accomplice and we don’t know of anything other than what I’ve already informed the Court that would indicate any involvement at all. He was there. At what point it goes past that, I don’t know what he’ll say.
“THE COURT: Zack, come up here. Come right down here. What’s your name?
“MR. MILLER: Zackery Miller.
“THE COURT: Zackery Miller. Do you have a middle name?
“MR. MILLER: Decor.
“THE COURT: Spell that.
“MR. MILLER: D-e-c-o-r.
“THE COURT: Now, Zackery, I don’t know what to do except to tell you this, because these gentlemen for the State and for the defendant know more about this case than I do, but they are warning me that things you say may implicate you in this crime that is charged against Felton Matthews. So I’m going to tell you this, that under the United States Constitution and the Constitution of the state of Alabama, you are not required to say anything in this courtroom, but, if you do take the stand and say things under oath, anything you say may be used against you. Do you understand what I’ve just said to you?
“MR. MILLER: Yes, sir.
“THE COURT: Is there any confusion about what I’m saying to you?
“MR. MILLER: No, sir.
“THE COURT: Another way of putting it is you have the right to say nothing.
“MR. MILLER: Yes, sir.
“THE COURT: Some people call it the invocation of their Fifth Amendment rights. Do you understand what I mean by that?
“MR. MILLER: Yes, sir.
“THE COURT: You also have the right to have a lawyer to advise you on whether you take the stand or not. And if you are unable to pay a lawyer, and if your parents have not provided you with a lawyer and can’t afford to hire you a lawyer, then I can provide one for you at no charge before any questioning is conducted today. Do you understand what I’m saying to you right there?
“MR. MILLER: Uh-huh.
“THE COURT: Do you have any questions about what I’ve just said?
“MR. MILLER: No, sir.
[[Image here]]
“THE COURT: And, in fact, if the State’s right in its theory, it would not be proper for Mr. Lampley to represent both you and Felton Matthews in this case, so Mr. Lampley really can’t advise you. If you want to talk to a lawyer before you take the stand, and if you’re not able to hire one and your parents haven’t provided you with a lawyer for this purpose, then I’ll provide one for you, and I’ll tell you also that you have the right to have a lawyer and your parent or guardian present before you take this stand and testify in this ease. Are your parents here now?
“MR. MILLER: No, sir.
“THE COURT: Do you have both parents living?
“MR. MILLER: Yes, sir.
“THE COURT: Do you want either or both of them here?
“MR. MILLER: It don’t really matter.
“THE COURT: Is that a yes or a no?
“MR. MILLER: No.
“THE COURT: Do you want me to provide a lawyer for you to talk to before you take the stand?
“MR. MILLER: No, sir.
“THE COURT: Are you sure?
*1210 “MR. MILLER: Yes, sir.
“THE COURT: Have you understood everything I have said to you?
“MR. MILLER: Yes.
“THE COURT: Has anybody promised you anything of value in order to get you to come in here and testify today?
“MR. MILLER: No, sir.
“THE COURT: Has Mr. Lampley threatened you in any way?
“MR. MILLER: No, sir.
“THE COURT: Has he promised you anything if you’ll testify in this case? “MR. MILLER: No, sir.
“THE COURT: Do you understand that if you do come in here and take an oath to tell the truth and nothing but the truth, that you must do just that?
“MR. MILLER: Yes, sir.
“THE COURT: Tell nothing but the truth, the whole truth, and nothing but the truth.
“MR. MILLER: Yes, sir.
“THE COURT: Do you understand that if you fail to do that, that it could at the very least cause you to be prosecuted for a crime known as perjury?
“MR. MILLER: Yes, sir.
“THE COURT: Do you know what perjury is?
“MR. MILLER: No, sir, but he explained it to me.
“THE COURT: Who’s that?
“MR. MILLER: Andy.
“THE COURT: Andy? Andy Jackson?
“MR. MILLER: (Nodded head.)
“THE COURT: Do you want to testify in this case?
“MR. MILLER: Yes, sir.
“THE COURT: You do?
“MR. MILLER: Yes, sir.
“THE COURT: Do you want me to call one or both of your parents before you make this decision?
“MR. MILLER: One.
“THE COURT: Sir?
“MR. MILLER: One.
“THE COURT: One. Who is that?
“MR. MILLER: Joyce McCaulley.
“THE COURT: Do you know how we can reach her?
“MR. LAMPLEY: Joyce McCaulley is Mr. Miller’s auntie. She works for Chrysler Acustar. I have a telephone number for her in my file.
“THE COURT: Is she your guardian?
“MR. MILLER: Well, you could say she is.
“THE COURT: Who do you live with? Who do you stay with?
“MR. MILLER: Well, I don’t stay with my mother. I just stay with a friend. “THE COURT: Do you spend more time with your aunt, this lady you’re talking about?
“MR. MILLER: Yes, sir.
“THE COURT: Do you want a lawyer to advise you on this before we go forward?
“MR. MILLER: Yes.”
(R. 567-75.) Following this exchange, Zackery Miller was appointed counsel. After Miller had conferred with his appointed counsel, he invoked his privilege under the Fifth Amendment and would not testify. The court adjourned for the day, and on the next day, the following exchange took place outside of the presence and hearing of the jury:
“THE COURT: All right, Zack, come on up to the bench young man. Now, Zack, I recessed the trial yesterday to give you an opportunity to talk to your aunt and to Mr. Barclay, whom I appointed to represent you or advise you, and after hav- ' ing talked to your aunt and Mr. Barclay overnight, do you intend to testify in this case?
“MR. BARCLAY: Your Honor, if I could speak on behalf of my client, he does intend to invoke his privilege under the Fifth Amendment of the United States Constitution, and Article 1, Section 5 of *1211 the Alabama Constitution, 1901, and would not testify.
“THE COURT: That would be as to any question asked of him other than his name and address?
“MR. BARCLAY: Yes, sir, as to any question addressing the events which occurred on March 7 of this year, that’s right.
[[Image here]]
“[THE COURT]: Now, Zack, I forgot to ask you yesterday, but how old are you?
“MR. MILLER: Eighteen.
“THE COURT: Eighteen?
“MR. BARCLAY: He turned eighteen last week. ¡
“THE COURT: You turned eighteen last week. You are presently being housed in our juvenile detention home accused of some act there. I don’t want to go into that, but is that correct?
“MR. MILLER: I didn’t hear you.
“THE COURT: Was that correct, Mr. Barclay?
“MR. BARCLAY: Yes, sir. He has pending charges.
“THE COURT: In the juvenile court?
“MR. BARCLAY: Yes, sir.
“THE COURT: What is your date of birth?
“MR. MILLER: 10/20/73.
“THE COURT: Now, you’ve talked to your auntie and you’ve talked to Mr. Barclay. Have you heard everything Mr. Barclay said here?
“MR. MILLER: (Nodded head.)
“THE COURT: Did you understand that?
“MR. MILLER: Yes, sir.
“THE COURT: With his advice, is that what you wish to do, invoke your Fifth Amendment privilege?
“MR. BARCLAY: Say yes.
“MR. MILLER: Yes.
“THE COURT: Now, gentlemen, last night, I stayed here late looking through the lawbooks. The case of Terry v. State, a 1988 Court of Criminal Appeals decision found at 540 So.2d, beginning at page 782, is very close to the facts of this case in almost all respects, including the underlying facts in which it was a homicide case and the defendant’s contention was that the victim attempted to grab the pistol, and, during the struggle, the victim was shot twice and killed. The facts are very similar.
“The only difference here is that it was the State who sought to put a witness on the stand in the presence of the jury to ask the witness a number of questions that would have the sole purpose of provoking the witness to invoke her — in that case a female — Fifth Amendment rights.
“Now, in that case, the Court of Criminal Appeals instructed that the better rule and practice would be for the trial judge to have a hearing outside the presence of the jury in order to determine before calling the witness to testify, whether the witness intended to assert his or her Fifth Amendment privileges. I have done that, and I am told very clearly that this witness will, which leads me next to the question of what I do.
“Now, the invocation of one’s rights under the Fifth Amendment to the United State’s Constitution and its corollary provision under the Alabama Constitution is an act from which a jury can draw no inference whatsoever. It would be my duty to explain that to the jury. I think, however, that to go through the charade of calling the witness, putting the witness on the stand, asking a series of questions to which the witness, individually or through counsel, invoked the Fifth Amendment privilege would create a situation of ineradicable error. I do not believe that any instructions of mine to that jury could erase those facts from their minds.
“I will, therefore, ask the detention officers to take this witness back to the detention home and keep him there. Mr. Lampley, you can confer with your client *1212 and decide what you choose to do about further witnesses at this point. The positions of both sides are well stated for the record. I hope that I have ruled correctly, but the decision as to whether I have or not will lie beyond this court. I think that I have.
(R. 578-89.)
The appellant contends that his right to have a key witness testify in his behalf far outweighs the witness’s right against self-incrimination. We agree. In this case, although Miller had the right to invoke the Fifth Amendment, the trial court erred by failing to require Miller to take the stand.
In Ex parte Reeves, 463 So.2d 177 (Ala. 1984), the defendant attempted to call a witness who had been present at the scene of the shooting in which this defendant was implicated. The witness, with the advice of counsel, informed the court outside the presence of the jury that he desired to invoke his Fifth Amendment privilege not to testify. In that case, the trial court granted the witness’s request even though the witness had not been asked any questions by the defendant. The Court of Criminal Appeals had affirmed the trial court’s judgment, holding that while the witness should have been allowed to take the stand, the defendant failed to preserve the error for review. Reeves v. State, 463 So.2d 174 (Ala.Cr.App.1984). The Supreme Court, reversing, held that:
“Trehern should have been required to take the stand in the presence of the jury and invoke his privilege in response to any question asked by the defendant which would have elicited incriminating evidence if answered.”
Ex parte Reeves, at 178.
Moreover, this court recently addressed this issue and held:
“With regard to the privilege against self-incrimination, the ‘correct’ rule is that ‘a witness, other than the defendant himself, cannot refuse to take the stand and testify by “taking the Fifth.” A witness may only invoke his Fifth Amendment privilege against self-incrimination after he has been sworn and asked a question which would elicit incriminating evidence if answered by such witness.’ Reeves v. State.”
J.D.S. v. State, 587 So.2d 1249, 1257 (Ala. Crim.App.1991).
While it is abundantly clear that a witness has the right to invoke the Fifth Amendment and refuse to testify, the witness must take the stand and have the questions posed before the Fifth Amendment can be invoked. In this case, the trial court should have required the witness to take the stand and have a question asked of him before it permitted the witness to invoke his Fifth Amendment privilege against self-incrimination. The trial court was in error on this issue, and we reverse the trial court’s ruling.
The judgment of the circuit court is reversed.
REVERSED and REMANDED.
All the Judges concur.