769 A.2d 192

**James Melvin GRAY,**

v.

**STATE of Maryland.**

**No. 5750, Sept. Term, 1998.**

Court of Special Appeals of Maryland.

March 28, 2001.

462

464

Michael R. Braudes, Asst. Public Defender (Stephen E. Harris, Public Defender, on the brief), Baltimore, for appellant.

Steven L. Holcomb, Asst. Atty. Gen. (J. Joseph Curran, Jr., Atty. Gen., Baltimore, and Leonard Collins, Jr., State's Atty. for Charles County, LaPlata, on the brief.)

Submitted before DEBORAH S. EYLER, RAYMOND G. THIEME, Jr. (Ret'd, Specially Assigned), and WILLIAM W. WENNER (Ret'd, Specially Assigned), JJ.

DEBORAH S. EYLER, Judge.

On November 30, 1995, James Melvin Gray reported his wife, Bonnie Gray, missing.[1] A week later, on December 6, 1995, Bonnie's nude body was found in the trunk of her car, on a construction site under development by Gray's brother. She had sustained ten cuts to the head, three gunshot wounds to the head, and a stab wound to the left chest penetrating her heart. In addition, five of her fingers had been cut off.

Gray was charged with first degree murder in the killing of his wife. His main theory of defense was that the murder had been committed by a man named Brian Gatton. To support this theory, Gray sought to introduce evidence connecting Gatton and Bonnie. His star witness for that purpose was a woman named Evelyn Johnson.

At the conclusion of a multi-week trial, a jury in the Circuit Court for Charles County convicted Gray of first degree murder. The court sentenced Gray to life imprisonment. On appeal, Gray presents a number of issues for review, which we have combined and reordered:

I. Did the trial court err in ruling inadmissible 1) statements by Brian Gatton to the effect that he had killed Bonnie; 2) evidence that Brian Gatton had raped

---

1. For ease of discussion, we shall refer to appellant, James Melvin Gray, by his last name and the victim, Bonnie Gray, and their daughter, Becky Gray, by their first names.

Evelyn Johnson; and 3) evidence that Brian Gatton had committed an armed carjacking?

II. Did the trial court err in ruling admissible 1) out-of-court statements by Bonnie about her intentions to tell Gray that she was leaving him and wanted a divorce; and 2) out-of-court statements by Gray that he would kill Bonnie if she left him or took their house and their six-year-old child, Becky, in a divorce proceeding?

III. Did the trial court err in denying Gray's requests to have Brian Gatton and another witness, George Wathen, invoke their Fifth Amendment privilege against self-incrimination in the presence of the jury, or, alternatively, in refusing to instruct the jury about the right of a witness to invoke that privilege?

IV. Did the trial court err in sustaining the State's objections to certain questions posed by Gray to State rebuttal witnesses?

For the following reasons, we conclude that the trial court did not err in its rulings. Accordingly, we shall affirm the judgment.

## FACTS AND PROCEEDINGS

The State's main witness against Gray was George Wathen, a convicted felon who at one point shared a cell with Gray in the Charles County Detention Center. According to Wathen, in November 1997, Gray admitted killing Bonnie and confided many details of the murder to him. On cross-examination, Gray attempted to impeach Wathen's testimony that Gray was the source of his information about the details of the murder by showing that Wathen had had access to Gray's legal documents containing much of the information that Wathen claimed Gray had told him.

Another witness called by the State, Twain Harrod, Sr., testified that on the night of November 29–30, 1995, after smoking crack, he picked up a hitchhiker near the access road to the construction site where Bonnie's body later was discov-

ered. He dropped the hitchhiker off at a road near Gray's residence. After Bonnie's body was found, the police showed Harrod a photographic array containing Gray's picture. At first, Harrod said he did not see the hitchhiker. He later identified Gray's picture as that of the hitchhiker.

Charles Raley, Jr., a friend of Gray's, testified that three or four months before Bonnie's death, Gray had visited him and had begun reading aloud a letter by Bonnie in which she complained about Gray not spending enough time with her. Gray stopped reading the letter midway through, pointed at Raley, and said: "If the bitch leaves me, I will kill her."

In early spring 1996, several months after Bonnie's death, Gray and a man named Jeffrey Davis were at Raley's house. Davis testified for the State and said that he heard Gray say, "the bitch wasn't getting my house" and "that's why I cut the bitch's fingers off, to get my wedding bands."

Frank Fertitta, a subcontractor who worked for Gray's brother, also testified for the State. In April or May 1993, Gray and Fertitta had several discussions about Gray's marriage to Bonnie, whom Gray referred to as "bitch." One day, Gray was extremely irate. He told Fertitta that "he would kill that bitch if she ever tried taking the house or kid."

The State also presented evidence tending to show that Gray was not upset upon learning that Bonnie was missing; that Gray made statements to police officers that were inculpatory; and that, the night before she disappeared, Bonnie told people that she wanted to end her marriage and was going to tell Gray that.

The defense adduced evidence that Gray was emotionally devastated upon learning of Bonnie's disappearance; that Bonnie had engaged in conduct inconsistent with an intent to end the marriage; that Wathen had access to documents that would have given him all of the information that he supposedly learned from Gray; and that Gatton, not Gray, was involved in the murder.

Additional facts will be recited as pertinent to our discussion of the issues.

## DISCUSSION

### I.

Gray first contends that the trial court erred in three rulings respecting alleged statements and conduct of Brian Gatton. The trial court ruled inadmissible the following evidence: 1) testimony by Evelyn Johnson about statements Gatton made to her to the effect that he had killed Bonnie Gray; 2) evidence that Gatton had raped Evelyn; and 3) evidence that Gatton had committed an armed carjacking. We will address these rulings separately.

### (1)

The State moved *in limine* to exclude from evidence statements Gatton allegedly made to Evelyn Johnson to the effect that he had killed Bonnie Gray. In order to rule on the evidentiary question, the trial court held a hearing and took testimony from Evelyn Johnson, out of the presence of the jury.

Evelyn stated that in 1995, her husband, Ron Johnson, and Ron's cousin, Twain Harrod, Sr., were drug dealers. Brian Gatton, whom Evelyn had known since high school, was a crack cocaine user and one of Ron's customers. Gatton and Ron were friends and had spent some time in prison together. According to Evelyn, when Gatton was under the influence of crack cocaine, he became extremely hostile. In addition, Gatton had a habit of carrying knives with him.

In late 1995, Gatton began coming by Evelyn and Ron's house to buy crack cocaine from Ron. On some of his visits, he brought Bonnie Gray with him and referred to her as his girlfriend. Evelyn's testimony was inconsistent and unclear with respect to how many of these visits occurred and when they occurred. She testified that on at least one visit, Becky Gray accompanied Gatton and Bonnie.

One time when Bonnie and Gatton were at her house, Gatton and Bonnie argued, and Evelyn heard Gatton call Bonnie a "bitch." Gatton became very hostile. When Bonnie left, Gatton said, "if he couldn't have her no [one] else would."

Evelyn went on to testify that on an unspecified day after the news of Bonnie's disappearance, but before her body was found, Gatton came to her house looking for Ron's "stash." Ron was not home. Gatton, who was "high and drunk," asked Evelyn where the "stash" was. When she said she did not know, Gatton raped her. The next day, or the day after, Gatton returned. Once again, Evelyn was by herself and Gatton was "high and drunk." Gatton told Evelyn, "I took care of her," meaning Bonnie. He then asked whether Evelyn had told anyone about the rape. When she said no, he told her that if she did tell anyone about it, he would "take care of her like he took care of Bonnie." As Gatton was speaking those words, he was brandishing a hunting knife and a hand-gun, which he had pulled out of his boot.

Until "about a week" before the hearing on the motion *in limine,* Evelyn told no one, including her husband, about the rape and what Gatton had said. According to Evelyn, when defense investigators questioned her about Bonnie's death, drug dealers in her neighborhood suspected that she was a "snitch" and began intimidating her. Evelyn told the defense investigators that she would reveal what she knew about Bonnie's death in exchange for "protection." The defense investigators then rented a moving truck, moved Evelyn into an apartment in Prince George's County, and arranged for her to live there rent-free. It was then—two years after Bonnie's death—that Evelyn first mentioned the rape and Gatton's remarks.

After Evelyn finished testifying, Gray argued that Gatton's out-of-court statements, "I took care of her" and "I'll take care of you like I took care of Bonnie," were admissible to prove the truth of the matter asserted (that Gatton had killed Bonnie) because they were declarations against penal interest, under Md. Rule 5–804(b)(3). The State argued that the

statements did not qualify as declarations against penal interest and lacked sufficient trustworthiness to be admissible under that exception to the rule against hearsay. The trial court ruled from the bench that the statements would not be admitted. It later issued a written opinion detailing its findings and reasoning.

Md. Rule 5–804(b)(3) provides, in relevant part:

Statement against interest. A statement which . . . at the time of its making . . . so tended to subject the declarant to civil or criminal liability . . . . that a reasonable person in the declarant's position would not have made the statement unless the person believed it to be true. A statement tending to expose the declarant to criminal liability and offered to exculpate the accused is not admissible unless corroborating circumstances clearly indicate the trustworthiness of the statement.[2]

In *State v. Standifur*, 310 Md. 3, 526 A.2d 955 (1987), which was decided before the Maryland Rules of Evidence were adopted in 1994, the Court of Appeals explained the proper analysis for deciding whether to admit a hearsay statement offered as a declaration against penal interest:

[The trial judge] must carefully consider the content of the statement in the light of all known and relevant circumstances surrounding the making of the statement and all relevant information concerning the declarant, and determine whether the statement was in fact against the declarant's penal interest and whether a reasonable person in the situation of the declarant would have perceived that it was against his penal interest at the time it was made. The trial

---

**2.** For a statement against penal interest to be admissible, the declarant must be unavailable. Md. Rule 5–804(a). In this case, when called to testify, Brian Gatton invoked his Fifth Amendment right against self-incrimination. Doing so rendered him unavailable to testify for purposes of Md. Rule 5–804. *See, e.g., Jacobs v. State*, 45 Md.App. 634, 653, 415 A.2d 590 (1980) ("The law is well-settled that the invocation of the privilege against compelled self-incrimination is a sufficient showing of unavailability.") (citing *Harris v. State*, 40 Md.App. 58, 63, 387 A.2d 1152 (1978)); Md. Rule 5–804(a)(1).

judge should then consider whether there are present any other facts or circumstances, including those indicating a motive to falsify on the part of the declarant, that so cut against the presumption of reliability normally attending a declaration against interest that the statements should not be admitted.

*Id.* at 17, 526 A.2d 955. Rule 5–804(b)(3) did not alter that holding.

In *State v. Matusky,* 343 Md. 467, 682 A.2d 694 (1996), the Court enumerated, in a footnote, the factors relevant to the decision whether a declaration against penal interest is clearly corroborated, and thus meets the "trustworthiness" requirement of Md. Rule 5–804(b)(3):

"(1) whether there is any apparent motive for the out-of-court declarant to misrepresent the matter, (2) the general character of the speaker, (3) whether other people heard the out of court statement, (4) whether the statement was made spontaneously, (5) the timing of the declaration and [ (6) ] the relationship between the speaker and the ... declarant."

343 Md. at 482 n. 7, 682 A.2d 694 (quoting *United States v. Alvarez,* 584 F.2d 694, 702 n. 10 (5th Cir.1978)).

Gray argues that the trial court's ruling was in error because the statements at issue qualified as declarations against penal interest, under Md. Rule 5–804(b)(3), and were sufficiently corroborated so as to meet the trustworthiness requirement of that rule.

█ The trial court ruled that the two statements in question, being in the nature of admissions to killing Bonnie Gray, clearly were against penal interest in that they tended to subject Gatton to criminal liability. For a statement to qualify as a declaration against penal interest, however, it not only must be inculpatory but also must be reliable in that a reasonable person in the declarant's position would have believed, when the statement was made, that it was against his penal interest. As the Court of Appeals explained in *State v. Standifur:*

Unless the declarant then believed the statement to be against his penal interest, there is no basis for presumed reliability. However, because of the unavailability of the declarant and other problems of proof, the party urging this exception is not required to prove the actual state of mind of the declarant but must prove sufficient surrounding facts from which the trial judge may inferentially determine what the state of mind of a reasonable person would have been under the same or similar circumstances. Although this test is essentially objective, it does envision consideration of the entire panoply of surrounding circumstances to the extent they may be known, including the age, education, background, experience and condition of the declarant. "Reasonable" as used in this context connotes a non-aberrant reaction by one in the declarant's circumstances, rather than the expected reaction of a hypothetical person of reasonable intelligence or sobriety. Thus, a trial judge may be called upon to determine whether a reasonable person who is under the influence or alcohol or drugs would have understood the disserving nature of a particular statement.

310 Md. at 12, 526 A.2d 955.

The trial court in the case *sub judice* applied the test articulated in *Standifur* and concluded that, even though the statements at issue were inculpatory, a reasonable person in Gatton's position would not have believed that they were against his penal interest. The court reasoned that the context of the statements made plain that they were spoken as threats to induce Evelyn's silence. Because it was known at the time that Bonnie Gray was missing and foul play was suspected, Gatton would have appreciated that his threat to kill Evelyn would be more effective if she thought that he already had killed Bonnie—irrespective of whether he actually had done so.

The trial court reasoned further that Gatton would have expected that including an "admission" to killing Bonnie in his threat against Evelyn would produce silence on Evelyn's part. Thus, he would not have thought that making the statements to Evelyn would have prompted her to repeat them and

thereby expose him to liability. The court also concluded that Gatton's physical state of being "high and drunk" made it unlikely that he was cognizant of the potential penal consequences of making the statements. Finally, the court deduced from the fact that Gatton knew that Evelyn was his cocaine supplier's wife, and that she associated with members of the criminal element, that Gatton would have believed it unlikely that she would have contacted the authorities.

We review rulings on evidence on an abuse of discretion standard. *West v. State,* 124 Md.App. 147, 164–70, 720 A.2d 1253 (1998); *Jacobs,* 45 Md.App. at 653, 415 A.2d 590. To the extent that in ruling on the admissibility of evidence the trial court makes findings of fact, we review those findings for clear error. *See Williamson v. United States,* 512 U.S. 594, 604, 114 S.Ct. 2431, 129 L.Ed.2d 476 (1994) (explaining that, under Federal Rule of Evidence 804(b)(3), whether a reasonable person in the declarant's position would have not made the statement unless he believed it to be true is a fact-intensive inquiry of the surrounding circumstances). We see no error or abuse of discretion in the trial court's conclusion that, under the circumstances in which Brian Gatton spoke the inculpatory words, he would not have thought that they would expose him to criminal liability.

Gray's primary argument respecting the trial court's ruling is that it erred in finding that there were no corroborating circumstances clearly indicating that the statements in question were trustworthy. He maintains that in analyzing the issue of trustworthiness, the trial court improperly engaged in an assessment of Evelyn's credibility. Because the trial court properly concluded that the statements did not qualify as declarations against penal interest for the reasons we have explained, its ruling was not in error, irrespective of its determination about trustworthiness. We nevertheless will address Gray's argument on this point.

In assessing the trustworthiness of Gatton's alleged statements, the trial court tracked the factors relevant to that issue as set forth in *State v. Matusky, supra,* 343 Md. 467, 682 A.2d

694. It concluded, respecting those factors: (1) that Gatton had a motive to misrepresent to Evelyn that he had killed Bonnie in that he wanted to make Evelyn think that he had done so, regardless of whether he had, to scare her, and thereby effectively threaten her; (2) that the "speaker" (Evelyn), an "admitted crack user," gave testimony that was "self-contradictory, confused, inexact, and incredible," did not disclose the alleged statements for nearly two years after they supposedly were made, and then did so only after repeatedly denying having any knowledge about Gatton and in circumstances in which she would be highly motivated to fabricate the statements; (3) that no one other than Evelyn had heard the statements; (4) that the statements, if made at all, were made spontaneously, in that they were not elicited by Evelyn; (5) that Evelyn's testimony about when the statements were made was unclear; and (6) that the relationship between Gatton and Evelyn was such that Gatton would not have been motivated to speak to her as a confidante; rather, he would have been motivated to keep her quiet. In addition, the trial court noted that the alleged statements were not self-verifying, *i.e.*, they did not contain details of the method of killing or disposal of the body that would provide corroboration.

In urging error by the trial court, Gray makes no reference to the six factors set forth in *State v. Matusky,* and does not address the trial court's findings respecting five of the six factors. He focuses exclusively on the "character of the speaker" factor (item 2 above). He does not argue that the trial court's assessment of Evelyn's character was flawed or that the facts upon which it relied in making that assessment were in error. Instead, he argues that by judging Evelyn's credibility as a witness, the trial court engaged in a function forbidden to it and consigned to the jury, as trier of fact, alone. In advancing this argument, Gray relies primarily on *People v. Barrera,* 451 Mich. 261, 547 N.W.2d 280 (1996). He also cites *People v. Cudjo,* 6 Cal.4th 585, 25 Cal.Rptr.2d 390, 863 P.2d 635 (1993), and *United States v. Brainard,* 690 F.2d 1117 (4th Cir.1982).

*People v. Barrera* is inapposite, and Gray's reliance on it is somewhat puzzling. In that case, four men were charged with murder and a number of sex crimes in the killing of a prostitute. Three of the men, including Barrera, were tried together. The fourth, one Michael Copeland, was tried separately. Copeland had given the police a written statement in which he admitted that, during the encounter between the four men and the prostitute, he and he alone had stabbed and killed her. In the trial of Barrera and his co-defendants, Copeland's statement was offered by the defense as a declaration against penal interest. The trial court ruled the statement inadmissible.

The Michigan Supreme Court concluded that the trial court's ruling was in error and reversed Barrera's conviction. In so ruling, the court explained that Michigan's declaration against penal interest rule is patterned on Federal Rule of Evidence (FRE) 804(b)(3) and pointed out that there is a split in the federal circuits over "whether the [trial] court must assess the credibility of the witness, or of the declarant, or of only the statement" in deciding whether the statement is sufficiently trustworthy to be admissible. 547 N.W.2d at 288 (footnotes omitted). The court went on to explain, however, that that issue was not implicated in its decision because whether Copeland had made an inculpatory statement and the words stated (as opposed to the significance of the words) were not in dispute. In other words, the credibility of the in-court witness becomes an issue when the making of the statement and its contents are in dispute.

The split in the federal courts referenced by the Michigan Supreme Court in *Barrera* can be illustrated by comparing *United States v. Brainard, supra,* 690 F.2d 1117, one of the cases Gray cites, to *United States v. Alvarez, supra,* 584 F.2d 694, which, as we have explained, was quoted by the Court of Appeals in *Matusky.* In *Brainard,* the Fourth Circuit said that FRE 804(b)(3) is designed to protect against the possibility that the out-of-court statement exculpating the accused was fabricated. For that reason, in deciding whether the statement is trustworthy enough to admit into evidence, the focus

should be on the veracity of the statement itself, not on the credibility of the declarant or of the in-court witness who is testifying about the statement. *Brainard,* 690 F.2d at 1124 (citing *United States v. Atkins,* 558 F.2d 133, 135–36 (3rd Cir.1977) (holding that the exclusion of a declaration against penal interest based on the lack of credibility of the in-court witness and of the declarant was error when circumstances corroborated the making of the statement)).

In *Alvarez,* by contrast, the Fifth Circuit reasoned that the trustworthiness of the statement against penal interest "is determined primarily by analysis of two elements: the probable veracity of the in-court witness, and the reliability of the out-of-court declarant." *Alvarez,* 584 F.2d at 701 (citing *United States v. Bagley,* 537 F.2d 162, 166–67 (5th Cir.1976)). The court went on to list the five factors later quoted in *Matusky* as "other indicia of trustworthiness." *See also United States v. Rasmussen,* 790 F.2d 55 (8th Cir.1986) (holding that factors listed in *Alvarez* are to be considered by the trial court in ruling on the admissibility of a statement against penal interest).

From the *Matusky* court's quotation of the *Alvarez* court's analysis of those factors relevant to the decision whether to admit a statement against penal interest, it appears that our Court of Appeals has approved that analysis and its underpinning: determining the truthfulness of the in-court witness and of the declarant, which necessarily involves making credibility assessments, is an aspect of the trial court's decision-making on the issue of trustworthiness. Moreover, especially in cases like the one *sub judice,* in which there is a dispute as to whether the statement was made at all and not only whether, if made, it affords a basis for the matter asserted in it, common sense dictates that the credibility of the in-court witness to whom the out-of-court declarant ostensibly made the statement is a necessary consideration.

 Furthermore, we see little merit to Gray's argument that by engaging in a credibility assessment of the in-court witness a trial court invades the province of the jury. The

decision whether a statement against penal interest is trustworthy, under Md. Rule 5–804(b)(3), requires the court to make factual findings and apply the applicable legal standard to them. *See also Bagley,* 537 F.2d at 166 (referring to FRE 804(b)(3)). It often is the role of the trial court in ruling on the admissibility of evidence to make factual findings. In ruling on motions to suppress evidence, for example, the trial court takes evidence, makes factual findings, including credibility assessments, and applies the law to the findings of fact. The trial court's role as fact-finder in that context does not invade the province of the jury. Indeed, as mentioned earlier, the Supreme Court has described the inquiry that a trial court makes in deciding whether a statement qualifies as one against penal interest as "fact-intensive." *Williamson,* 512 U.S. at 604, 114 S.Ct. 2431; *see also Corbett v. State,* 130 Md.App. 408, 426–27, 746 A.2d 954, *cert. denied,* 359 Md. 31, 753 A.2d 3 (2000); Md. Rule 5–104(a) (providing that a trial court decides preliminary questions of fact concerning the admissibility of evidence).

We hasten to point out that, even if we agreed with Gray that a trial court should not make a credibility judgment about the in-court witness in ruling on the admissibility of a declaration against penal interest, we nonetheless would conclude that the trial court did not abuse its discretion in excluding Gatton's statements. See *United States v. Satterfield,* 572 F.2d 687, 692 (9th Cir.1978) (holding that the trial court had not abused its discretion, even though it had erroneously considered the credibility of the in-court witness). The court's findings respecting the other "indicia of trustworthiness" factors set forth in *Matusky* support its conclusion that the statements in question did not meet the trustworthiness test of Md. Rule 5–804(b)(3). *Id.* at 692–93 (concluding that it was "unnecessary for the court to decide whether [FRE] 804(b)(3) ever empowers a judge to exclude hearsay evidence because of the untrustworthiness of the witness or whether it empowers exclusion of that evidence on that ground in the specific circumstances of this case," because other considerations un-

dermined the trustworthiness of the statement against penal interest).

The trial court concluded, as discussed, *supra,* that Gatton had a clear motive to fabricate in assessing the reliability of a declaration against penal interest. *Standifur,* 310 Md. at 20, 526 A.2d 955; *see also People v. Pecoraro,* 175 Ill.2d 294, 222 Ill.Dec. 341, 677 N.E.2d 875, 892 (1997) (concluding that the out-of-court statement of a third party that he had killed the victim was inadmissible in the defendant's trial because the self-incriminating portion of the statement may have been "bravado designed to bolster the threat" that the third party made to another person). It also gave weight to the fact that Evelyn was the only person present when the statements allegedly were made. Finally, the trial court reasonably concluded that the relationship between Evelyn and Gatton was not one in which he would have made such a statement, absent a motive to fabricate.

### (2)

On cross-examination before the jury, the State questioned Evelyn Johnson about the fact that for two years after Bonnie's death, she did not come forward with information connecting Gatton to Bonnie Gray, and possibly to her murder. Evelyn acknowledged that she had withheld this information from defense investigators when they first interviewed her and that, even after disclosing the information to them, she had not gone to the police.

On redirect, defense counsel asked Evelyn why she had not been more forthcoming in providing information to the police immediately after Bonnie's death. Defense counsel was seeking to elicit from Evelyn that she had been fearful of Gatton, because he had raped her, and that she had delayed coming forward for that reason. The State objected to the question on the ground that it was beyond the scope of cross-examination. The trial court sustained the objection. Gray argues on appeal that the evidence the question sought to elicit was not outside the scope of the State's cross-examination and, therefore, the court abused its discretion in ruling it inadmissible.

■ The scope of re-direct examination is limited to the scope of cross-examination. *Bell v. State*, 118 Md.App. 64, 95, 701 A.2d 1183 (citing *Coates v. State*, 90 Md.App. 105, 111–13, 600 A.2d 856 (1992)), *rev'd on other grounds*, 351 Md. 709, 720 A.2d 311 (1998). "The trial judge's discretion in controlling the scope of redirect examination is wide." *Daniel v. State*, 132 Md.App. 576, 583, 753 A.2d 545 (2000) (citing *Bailey v. State*, 16 Md.App. 83, 110–11, 294 A.2d 123 (1972)).

■ At no time during its cross-examination of Evelyn did the State inquire about her reluctance or failure to speak to the police about what she knew immediately after Bonnie's death. Accordingly, the trial court did not abuse its discretion in ruling that defense counsel's question on re-direct was beyond the scope of the State's cross-examination.

■ Still on re-direct, defense counsel asked Evelyn why she had not been more forthcoming in her initial discussion with defense investigators. Again, defense counsel was attempting to elicit that Evelyn had been raped by Gatton, and for that reason was afraid to come forward with information against him. The State objected to the question on the ground that the probative value of the evidence was outweighed by its potential to cause prejudice and confusion. The trial court sustained the objection. It permitted Evelyn to testify, however, that she was not more forthcoming with her information about Gatton because she feared "something about [Gatton's] personality and behavior."

Gray contends that the trial court abused its discretion in so ruling. He argues that the risk that the evidence would confuse the jurors was not substantially outweighed by its probative value. He also argues that the evidence was admissible because it was probative of a propensity for violence on Gatton's part. Finally, he argues that even if the evidence that Gatton had raped Evelyn had little probative value, the State nevertheless had "opened the door" to its admission. We disagree.

Under Md. Rule 5–403, the trial court may exclude evidence if "its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury." In other words, the court may decline to admit evidence that has some probative value, and thus is relevant, when the evidence could confuse or sidetrack the jury. Joseph F. Murphy, Jr., *Maryland Evidence Handbook* § 506(c), at 183 (3d ed.2000); *cf. Pickett v. State,* 120 Md. App. 597, 605, 707 A.2d 941 (1998) (citations omitted). The court's decision in that regard is discretionary.

We see no abuse of discretion in the trial court's ruling that the probative value of the evidence that Brian Gatton had raped Evelyn Johnson was greatly outweighed by its potential to cause confusion. To be sure, the evidence that Evelyn was in fear of Gatton was relevant to why she had not been more forthcoming with information linking Gatton to Bonnie Gray, and thus had a bearing on her credibility as a witness. *See e.g., Washington v. State,* 293 Md. 465, 472, 445 A.2d 684 (1982). Yet, the event that was the basis for Evelyn's fear— the rape—existed only as an unproven allegation. Testimony from Evelyn about her having been raped by Gatton was highly likely to lead the jury on a detour into whether the rape in fact had happened. To avoid the jury's being distracted with that collateral issue, the trial court decided, quite reasonably, to allow Evelyn to testify generally, but not specifically, about the basis for her fear of Gatton.

Likewise, the trial court rejected Gray's argument that the value of the evidence of the alleged rape to show Gatton's "proclivity for violently assaulting people" was so compelling that it outweighed its potential to cause jury distraction. Md. Rule 5–404(a)(1) provides that, in general, evidence of a person's character is not admissible for the purpose of proving "action in conformity therewith on a particular occasion." Even if evidence of Gatton's propensity for violence could have been admitted to show that he murdered Bonnie, notwithstanding the prohibition just referenced, its admissibility nevertheless was subject to a probative-value/risk-of-prejudice weighing, under Md. Rule 5–403. The trial court engaged in

that analysis and, for the reasons we have explained, acted reasonably in excluding the evidence, given that it would likely distract the jury.

■ Finally, the "opening the door" doctrine does not support Gray's argument on this issue. Under that doctrine, which is one of expanded relevancy, initially irrelevant evidence is made relevant by questions that "open the door." *Daniel*, 132 Md.App. at 591, 753 A.2d 545 (citations omitted). In this instance, the evidence in question was relevant to begin with, in that it tended to explain Evelyn's two-year silence. The problem with it, and the reason that the trial court ruled it inadmissible, was that, in the court's view, its relevancy was outweighed by its tendency to distract and confuse. In *Clark v. State*, 332 Md. 77, 629 A.2d 1239 (1993), the Court of Appeals explained:

> [T]he "opening the door" rule has its limitations. For example, it does not allow injecting collateral issues into a case or introducing extrinsic evidence on collateral issues. Such evidence is also subject to exclusion where a court finds that the probative value of the otherwise inadmissible responsive evidence "is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence."

*Id.* at 87, 629 A.2d 1239 (quoting Rule 5–403) (citations omitted).[3]

### (3)

Gray contends that the trial court erred in excluding evidence that three months after Bonnie was murdered, Gatton committed a carjacking. Before trial, the court held a hearing

---

3. Gray also argues on appeal that the trial court erred in excluding evidence of the rape because it was only by testifying about the rape that Evelyn could explain prior inconsistent statements that she made. *See* Md. Rule 5–613(a). Gray did not raise this argument in the trial court. Accordingly, it is waived. *See Klauenberg v. State,* 355 Md. 528, 541, 735 A.2d 1061 (1999) (citations omitted).

and took evidence for the purpose of ruling on the admissibility of that evidence.

Sergeant H.R. Rich testified about information given to him by the carjacking victim. The victim related that, at 2:00 a.m. on the morning of February 26, 1996, she was outside a bowling alley at the intersection of Route 263 and Route 2/4 in Calvert County. Gatton forced his way into her car and, brandishing an "Old Timer's" knife, drove her into Charles County. Gatton demanded money and the car from the victim. When she told him that she only had $8, he demanded more money and unbuttoned her blouse to search for valuables in her brassiere. The victim was wearing jewelry, but Gatton did not demand or take it. Gatton ordered the victim out of the car a quarter-mile west of Latham Court, in Indian Hills. Before leaving the car, the victim retrieved her purse, in which she had approximately $200. The victim was not injured. Gatton abandoned the victim's automobile at a convenience store. When Gatton was arrested for the carjacking, he had several knives in his possession.

Deputy Michael Bomgardner testified about the facts surrounding Bonnie's disappearance and the discovery of her body. He related the facts we have discussed, *supra.* In addition, he testified that Gray and Becky told police investigators that on the morning of her disappearance, between 5:45 a.m. and 6:00 a.m., Bonnie had left home to go to work in Washington, D.C. That was her usual time to leave the house in order to meet the members of her car pool at a nearby Park & Ride. The Park & Ride in question is catty corner to the convenience store at which Gatton abandoned the carjacking victim's car.

Deputy Bomgardner stated that there was no evidence that Bonnie's car had been stopped on the morning of her disappearance. When Bonnie's body was found in the trunk of her car, she was clad in black boots and torn black pantyhose, and nothing else. Bonnie often wore bracelets, rings on nearly every finger, and a watch. No such items were recovered from her body, however.

Gray argued that evidence that Gatton committed the February 26, 1996 carjacking was probative of the issue of identification in the case against him in that similarities in the crimes tended to show that Gatton had committed both of them. The State countered that the crimes were too different to have the probative value Gray was attempting to assign them. The trial court, agreeing with the State, ruled the evidence inadmissible. It concluded that the evidence was irrelevant and, in the alternative, if relevant, was likely to confuse the jury and cause undue waste of time.

Relying on *Sessoms v. State,* 357 Md. 274, 744 A.2d 9 (2000), Gray contends that the trial court erred because it applied an incorrect standard to determine the admissibility of "reverse other crimes evidence." In the alternative, Gray argues that the court applied the correct standard but erred in arriving at the incorrect result. Gray points out that there were facts in evidence to show that he and Gatton were similar in appearance (at least at that time), the offenses took place within four months of each other, and the carjacking victim was found within a half-mile of the site at which Bonnie's body was found.

Md. Rule 5–404(b) provides:

*Other crimes, wrongs, or acts.* Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, common scheme or plan, knowledge, identity, or absence of mistake or accident.

Typically, evidence of this sort (i.e., "other crimes evidence" or "other bad acts evidence") is offered by the State against the defendant, for any of the purposes provided in Md. Rule 5–404(b). *See also United States v. Stevens,* 935 F.2d 1380, 1401–02 (3d Cir.1991) (discussing FRE 404(b)). In the less typical case, the defendant may offer such evidence defensively, to exculpate himself. Courts and commentators frequently refer to this as "reverse other crimes evidence." *Sessoms,* 357

Md. at 278, 744 A.2d 9; *see United States v. Walton*, 217 F.3d 443, 449 (7th Cir.2000) (" '[E]vidence regarding other crimes is admissible for defensive purposes if it "tends, alone or with other evidence, to negate [the defendant's] guilt of the crime charged against him." ' ") (quoting *Agushi v. Duerr*, 196 F.3d 754, 760 (7th Cir.1999) (quoting *United States v. Stevens*, 935 F.2d at 1404)).

Under Md. Rule 5–404(b), *exclusion* is presumed, unless the evidence is found to be specially relevant and otherwise meets the analytical criteria set forth in *State v. Faulkner*, 314 Md. 630, 552 A.2d 896 (1989), which held that the State may introduce other crimes evidence against the defendant only "if it is substantially relevant to some contested issue in the case and if it is not offered to prove the defendant's guilt based on propensity to commit crime or his character as a criminal." *Id.* at 631, 552 A.2d 896. In *Sessoms v. State, supra*, 357 Md. 274, 744 A.2d 9, the Court held that the admissibility of reverse other crimes evidence is not governed by Md. Rule 5–404(b). It concluded that the word "person" in that rule means the defendant. Accordingly, the admissibility of reverse other crimes evidence, *i.e.*, evidence that someone other than the defendant committed other crimes or bad acts, is governed by Md. Rule 5–403, under which *inclusion* is presumed. *Accord Walton*, 217 F.3d at 449 (citation omitted); *Stevens*, 935 F.2d at 1404–05 (holding that the admissibility of reverse other crimes evidence "depends on a straightforward balancing of the evidence's probative value against considerations such as undue waste of time and confusion of the issues").

Gray argues that the trial court, which rendered its decision in this case before the Court of Appeals decided *Sessoms v. State*, erred by applying Md. Rule 5–404(b), with its standard of presumed exclusion, instead of Md. Rule 5–403, with its standard of presumed inclusion, in determining the admissibility of the carjacking evidence. He is incorrect. At trial, Gray relied heavily on *United States v. Stevens, supra*, to argue that evidence of the carjacking was admissible if it was

relevant and not substantially outweighed by the consider-
ations set forth in Md. Rule 5–403. The trial court ruled
that even under [*Stevens* ] the facts of this case require that
the evidence of the February 25th carjacking, the Gatton
crime, be excluded.

According to [*Stevens* ] the admissibility of the reverse
404(b) evidence is governed by a balancing test. The admit-
ting court must balance the evidence's probative value
against considerations such as undue waste of time and
confusion of the issues for the jury. To put it in terms of
the Maryland Rules of Evidence the Court must weigh the
evidence value under 5–401 against 5–403.... [T]he reverse
404(b) evidence must merely have a tendency to negate the
accused's guilt and pass the 403 balancing test.

Thus, the record makes clear that, even though the Court of
Appeals had not yet decided *Sessoms v. State* when the trial
court made its ruling, the trial court applied the Md. Rule 5–
403 balancing test to the carjacking evidence and, on the basis
that the probative value of the evidence was outweighed by its
potential to cause confusion, exercised its discretion to exclude
it. The court applied the correct standard in analyzing the
admissibility of the carjacking evidence.

Gray also argues that the trial court erred in ruling that
similarities between the carjacking and Bonnie's murder need-
ed to be shown for the carjacking evidence to be admissible
under Md. Rules 5–401 and 5–403. We disagree with Gray's
assertion that whether the crimes were similar, though impli-
cated in a Md. Rule 5–404(b) analysis, should not be consid-
ered by the trial court in deciding relevancy and engaging in a
probative value versus prejudicial effect analysis. In *United
States v. Stevens,* the court explained:

It should be noted that ["other crimes"] evidence may be
also available to *negative the accused's guilt.* E.g., if A is
charged with forgery and denies it, and if B can be shown to
have done a series of similar forgeries connected by a plan,
this plan of B is some evidence that B and not A committed
the forgery charged. This mode of reasoning may become

the most important when A alleges that he is the victim of mistaken identification.

*Stevens,* 935 F.2d at 1402 (quoting 2 John Henry Wigmore, *Wigmore on Evidence* § 304, at 252 (J. Chadbourn rev. ed.1979)). Thus, given that Gray's theory of defense was that Gatton, not he, had killed Bonnie, and his purpose in offering the carjacking evidence was to show that the carjacking so resembled Bonnie's murder that it made it more likely that both crimes were committed by the same person, it was entirely proper for the trial court to focus on the issue of similarity in deciding whether the carjacking evidence was admissible under Md. Rule 5–403.

 Moreover, the trial court's conclusion that the crimes were not similar, so as to make proof that Gatton committed the carjacking probative of whether Gray did not murder Bonnie, was sound. The circumstances surrounding the carjacking differed greatly from those surrounding Bonnie's murder. Among the numerous differences: Gatton did not harm the carjacking victim, whereas Bonnie was shot, stabbed, mutilated, stripped, placed in a trunk, and abandoned; Bonnie was not the victim of a carjacking before her death; Gatton permitted the carjacking victim to keep her jewelry, whereas Bonnie's killer stole all of her jewelry by amputating her fingers; Gatton used an "Old Timer's" knife to commit the carjacking, whereas Bonnie's killer used a knife and gun; and Gatton permitted the carjacking victim to keep her purse, whereas Bonnie's killer took everything she had except her boots and torn pantyhose. With regard to the purported similarities of the crimes in time and geography, the trial court aptly observed:

> Many of the quote similarities cited by defense counsel are hardly that. For example proximity in time. Nearly 90 days elapsed from the time Bonnie Gray was killed to the [carjacking.] Almost three months is a far cry from close in time.
>
> Rather than ending up in the same area the Gatton victim and Bonnie Gray [were] found a half mile apart. While it is

something of a coincidence that they both ended up in Charles County along Route 231, it is not altogether extraordinary that given that Route 231 is only one of two ways in and out of Calvert County. Moreover, any importance this coincidence might have is completely undermined by the vastly different events that took place. The Gatton victim was let out unharmed along the side of the road, while Bonnie Gray was left dead in the trunk out of the sight of the road.

*Cf. State v. Jones,* 284 Md. 232, 243, 395 A.2d 1182 (1979) ("[M]ere proximity in time and location within which several offenses may be committed does not necessarily make one offense intertwine with the others. Immediateness and site are not determinative." (citations omitted)).

The trial court did not abuse its discretion in concluding that to the extent that the carjacking evidence had any probative value, that value was substantially outweighed by the likelihood that it would sidetrack the jury from its task and unnecessarily prolong the already lengthy trial.

## II.

### (1)

In early November, 1995, Bonnie spoke to Gene Edwards, a member of her car pool, about her marriage. Bonnie told him that she no longer wanted to be married to Gray, that she had seen an attorney, and that she was planning to leave Gray shortly after Christmas. Also in early November 1995, Bonnie had a similar conversation with Esther Edwards, another member of her car pool.

On November 28, 1996—two days before she disappeared—Bonnie spoke with Betty Steihm, a co-worker, about her marriage. Bonnie indicated that she intended to divorce Gray, but that she was not going to leave the marital home. After her car pool returned to the Park & Ride later that same day, Bonnie told Edward Burns, another car pool member, that she intended to divorce Gray after Christmas.

On the afternoon of November 29, 1995—the day before she disappeared—Bonnie went to the daycare center that Becky attended to pick her up. While there, Bonnie spent about 45 minutes talking to Debra Thacker, the owner of the center, and June Megonical, the center's director, about her plans to divorce Gray. According to Megonical, Bonnie said that she was going to "have it out with [Gray] that night," that she could "no longer keep . . . Becky in that kind of environment," and that she had planned on leaving after the holidays, but "could not tolerate it any more." Thacker testified that Bonnie "said she was going to go home and she had had enough, she was fed up and that she was going to leave and tell Jimmy that she wanted a divorce."

Before trial, the court addressed the admissibility of all of these hearsay statements. The State argued that they were admissible, under Md. Rule 5–803(b)(3), as statements of Bonnie's then-existing intention to act in the future, and that they were relevant to motive, in that they provided circumstantial evidence that the night before she disappeared, Bonnie told Gray that she intended to divorce him. Gray argued, *inter alia,* that the statements were inadmissible because there was no corroborating evidence that Bonnie had acted on her stated intentions.

The trial court ruled that Bonnie's statements to Megonical and Thacker were admissible to show Bonnie's then-existing intention to tell Gray that she wanted a divorce and that she had acted on that intention, *i.e.,* that she had told Gray that she wanted a divorce. The trial court ruled that Bonnie's statements to Gene and Esther Edwards, Betty Steihm, and Edward Burns were not admissible to show that Bonnie had told Gray she wanted a divorce because, although the statements evidenced Bonnie's present intention to seek a divorce, they did not evidence Bonnie's present intention to tell Gray that she wanted a divorce. The court indicated, however, that, if Gray presented evidence that he and Bonnie had a happy marriage and that Bonnie would not have wanted a divorce, he would "open the door" and the statements would come into evidence.

During a bench conference, Gray renewed his objection to the admission of Bonnie's statements to Megonical and Thacker and requested a continuing objection, which the trial court allowed. The trial court assured Gray that it would be aware of the continuing objection during witness testimony regarding the hearsay statements and that it was unnecessary for him to object. Gray then re-stated for the record the basis for his objection.

Bonnie's statements to Thacker and Megonical came into evidence during the State's case-in-chief. Gray objected to their admission when they were offered into evidence. Because Gray presented evidence in the defense case that he and Bonnie had a happy marriage, the other hearsay statements about Bonnie's intention to seek a divorce were admitted into evidence during the State's rebuttal case. *See e.g., State v. Lambert,* 341 N.C. 36, 460 S.E.2d 123, 131 (1995) ("Testimony about the positive state of the marital relationship opened the door to rebuttal evidence showing that the defendant through that the relationship was not 'fine' or 'excellent.' "). Gray did not lodge objections to these statements and does not challenge their admission on appeal.

The trial court instructed the jury as follows:

Now, you have heard testimony that on a certain day Bonnie Gray made a statement that she was going to go home and tell her husband in essence that she wanted a divorce. This statement was admitted only to show the state of mind or intention of Bonnie Gray at the time she made the statement.

This statement may be used and considered by you to determine if Bonnie Gray carried out her intention to go home and tell her husband that she wanted a divorce.

You play [sic] not infer anything about any action of Bonnie or Jim Gray by November 29th, 1995 from this statement. The statement may only be utilized by you in considering motive or lack of motive of James Gray.

Additionally, you have heard testimony about various statements Bonnie Gray made about her attitude toward the

marriage. These statements were only admitted to show the state of mind of Bonnie Gray at the time she made the statements. You may not consider them to show the state of mind of James Gray or for any other purpose.

On appeal, Gray contends that the trial court erred by admitting Bonnie's statements to Megonical and Thacker into evidence to prove that Bonnie went home on the evening of November 29, 1995 and told Gray that she wanted a divorce. He argues that the statements were not admissible because there was no corroborating evidence to show that Bonnie followed through on her stated intentions.

■ Under Md. Rule 5–803, a hearsay statement reflecting the declarant's "state of mind" when the statement was made is admissible to prove, *inter alia*, the declarant's future action:

> The following are not excluded by the hearsay rule, even though the declarant is available as a witness:
>
> . . .
>
> (b)(3) Then existing mental, emotional, or physical condition. A statement of the declarant's then existing state of mind, emotion, sensation, or physical condition (such as intent, plan, motive, design, mental feeling, pain, and bodily health), offered to prove the declarant's then existing condition *or the declarant's future action,* . . . .

(Emphasis added.) This exception "is not monolithic, but embraces two subspecies: 1) a declaration of present mental or emotional state to show a state of mind or emotion in issue, and 2) a declaration of intention offered to show subsequent acts of declarant." *Robinson v. State,* 66 Md.App. 246, 257, 503 A.2d 725 (1986).

Md. Rule 5–803(b)(3) codifies "part of the holding in *Mutual Life Insurance Co. v. Hillmon,* [145 U.S. 285, 12 S.Ct. 909, 36 L.Ed. 706 (1892)], under which the declarant's statement of intention is admissible to show that the *declarant* subsequently acted in accord with the stated intention." Lynn McLain, *Maryland Rules of Evidence* § 2.803.4(n) (1994) ("McLain");

*see* Murphy, *supra,* § 803(D), at 312 ("The Rules Committee intended that, under Md. Rule 5–803(b)(3), statements of intent would be admissible for the limited purpose of proving the conduct of the declarant only,....").[4]

In *Kirkland v. State,* 75 Md.App. 49, 540 A.2d 490 (1988), we discussed the *Hillmon* doctrine and its use in Maryland. In that case, Kirkland argued that the trial court abused its discretion by admitting his statement that he intended to kill the victim, Andrew Church, as circumstantial evidence to prove that, in fact, he had killed Church. Rejecting his argument, we observed:

> [Professor John] McCormick states that "the probative value of a state of mind obviously may go beyond the state of mind itself." ... Indeed, it may go so far as to prove subsequent conduct:
>
>> Despite the failure until fairly recently to recognize the potential value of statements of state of mind to prove subsequent conduct, it is now clear that out-of-court statements which tend to prove a plan, design, or intention of the declarant are admissible, subject to the usual limitations as to remoteness in time and perhaps apparent sincerity common to all statements of mental state, to prove that the plan, design, or intention of the declarant was carried out by the declarant.
>
> ... The leading case for this proposition is *Mutual Life Insurance Co. v. Hillmon,* .... In *Hillmon,* the matter chiefly contested was the death of the insured, John Hillmon. The resolution of that issue depended upon whether the body found at Crooked Creek, Kansas was Hillmon's

---

4. Some federal courts have held, based on *Hillmon,* that a declarant's statement of intent may only be used to prove the conduct of individuals who are mentioned in the statement, but are not the declarant. *See e.g., United States v. Pheaster,* 544 F.2d 353 (9th Cir.1976). Rule 5–803(b)(3) does not permit a declarant's statement of future intent to be admitted to show the conduct of any individual other than the declarant. Murphy, *supra,* § 803(E)(2), at 312–13. The trial court instructed the jury to use Bonnie's statements only as evidence of her intent and her subsequent conduct.

body or the body of his traveling companion Walters. The evidence sought to be admitted were letters written by Walters indicating his intention of traveling with Hillmon. The Court found these declarations of intent admissible to prove other matters which were in issue, *e.g.*, whether Hillmon went to Crooked Creek and whether the dead body was his. Maryland is in accord with *Hillmon*. ... Simply stated, the *Hillmon* doctrine provides that when the performance of a particular act by an individual is an issue in the case, his intention (state of mind) to perform that act may be shown. Kirkland's declaration indicated an intent to kill Andrew Church, who later died due to gunshot wounds inflicted by Kirkland. The *Hillmon* Doctrine allows the trial court to admit Kirkland's statement as circumstantial evidence that he carried out his intention and performed the act.

*Id.* at 55–56, 540 A.2d 490 (citations omitted); *see also National Soc'y of the Daughters of the Am. Revolution v. Goodman*, 128 Md.App. 232, 238, 736 A.2d 1205 (1999).

■ Preliminarily, the State contends that Gray waived his challenge to the admission of Bonnie's statements to Megonical and Thacker by failing to object to the admission of Bonnie's statements to Gene Edwards, Esther Edwards, Bonnie Steihm, and Edward Burns. We disagree. The statements to Megonical and Thacker came into evidence on different grounds than did her statements to the others, for the reasons we have explained. Gray preserved for review his objection to the admission of Megonical's and Thacker's statements by making continuing and specific objections to their admission. *See Hall v. State*, 119 Md.App. 377, 390–91, 705 A.2d 50 (1998); *Beghtol v. Michael*, 80 Md.App. 387, 564 A.2d 82 (1989); Md. Rule 2–517(a). His failure to object to the admission of the other statements into evidence, on other grounds, did not constitute a waiver of his objections to Megonical's and Thacker's statements.

In arguing that Bonnie's statements to Megonical and Thacker, that she intended to go home on the evening of

November 29, 1995, and tell him she wanted a divorce, were inadmissible, Gray urges, in essence, that we interpret Md. Rule 5–803(b)(3) to include a corroboration requirement.

"In construing a rule, we apply principles of interpretation similar to those used to construe a statute." *Holmes v. State,* 350 Md. 412, 422, 712 A.2d 554 (1998) (quoting *State v. Harrell,* 348 Md. 69, 79–80, 702 A.2d 723 (1997) (citations omitted)). "In ascertaining the intention of the Court of Appeals in promulgating the rule, we look first to the words used in the rule. When the language of the rule is clear and unambiguous, we construe the words in accordance with their plain meaning." *In re Levon A.,* 124 Md.App. 103, 121, 720 A.2d 1232 (1998) (citing *In re Victor B.,* 336 Md. 85, 94, 646 A.2d 1012 (1994)), *rev'd on other grounds,* 361 Md. 626, 762 A.2d 572 (2000).

Unlike the hearsay exception for declarations against penal interest, discussed *supra,* Md. Rule 5–804(3) does not include language requiring corroborative evidence. Moreover, there is nothing in the history of Md. Rule 5–803(b)(3), the Supreme Court's analysis in *Hillmon,* or our discussion in *Kirkland* to suggest that the admissibility of a hearsay statement of future intention hinges on the existence of corroborating evidence that the declarant completed the intended act.

Gray relies on *United States v. Hogan,* 886 F.2d 1497 (7th Cir.1989), to support his argument that corroborating evidence was required. In that case, Judge Martin Hogan participated in an elaborate bribery scheme in which several lawyers paid him to "steer" clients to them, allow solicitation of clients in his courtroom, and rule in favor of their clients. At trial for bribery, filing false tax returns, and violating the RICO statutes, one of the issues to be decided was how Hogan had received large amounts of money in September 1979. Hogan proffered the testimony of one Tim Smith, who would have testified that his father, Tempel Smith, Sr., had told Tim's cousin that he wanted to give Hogan some money, that Tim's cousin had replied that he could not give Hogan money because Hogan was a judge, and that Tempel Smith, Sr. had

responded that he could give Hogan money if it was a gift and not payment for services. The trial court ruled that this testimony failed to show that Tempel Smith, Sr. had stated his intention to give Hogan a cash gift in September 1979 and, therefore, was too vague and speculative to be admissible.

The United States Court of Appeals for the Seventh Circuit agreed. It observed that statements of a then-existing intent to act offered to prove the subsequent occurrence of the act

derive reliability and probative value from their nexus to the act itself. . . . To identify that nexus, courts will consider the contemporaneous nature of the statements and the act, the chance for later reflection, and the relevance of the state- ments. . . . The contemporaneous nature of the statements and the act preclude problems of perception and memo- ry. . . .

Tempel Smith, Sr.'s comments to his nephew did not contain these indicia of reliability. It was unclear from his comments whether he actually intended to give Hogan cash or was merely considering the possibility. He did not indicate when he intended to give Hogan the money, and in fact, his comments suggest his uncertainty as to whether such a gift would be proper. This speculation indicates that, given a chance to reflect on the matter, Tempel Smith, Sr. may have reconsidered his proposal. Likewise, Tim Smith testified that he thought the conversation occurred in the summer or fall of 1979 but could not specify the month or the amount of money that his father was considering as a gift. The comments themselves and the surrounding cir- cumstances simply do not indicate to us that the statements were a reliable indication of Tempel Smith, Sr.'s state of mind at the time that Hogan testified that Tempel Smith, Sr. actually gave him the money.

*Id.* at 1512 (citations omitted).

Gray argues that in light of evidence that showed that he and Bonnie had a tumultuous relationship, if "given a chance to reflect on the matter," like Tempel Smith, Sr., Bonnie may have reconsidered her intention to tell him she wanted a

divorce; therefore, her hearsay statements should not have been admitted to prove that she acted on her stated intention, absent corroborating evidence. Yet, nothing in the court's analysis in *Hogan* suggests that corroborating evidence is required. Rather, *Hogan* stands for the proposition that a trial court may exclude vague, speculative, and untrustworthy hearsay statements. The exclusion of such statements is consistent with Maryland law: "Subsection (b)(3) [of Md. Rule 5–803] does not add express language precluding admissibility when circumstances indicate that a statement lacks trustworthiness. Such exclusion is already appropriate under Rule 5–403, and is consistent with Maryland common law." McLain, *supra*, § 2.803.4(n), at 254 (citing *Robinson*, 66 Md.App. at 251–53, 503 A.2d 725). Gray did not argue that the probative value of Bonnie's statements to Megonical and Thacker was substantially outweighed by counterveiling considerations, such as unfair prejudice. Moreover, the statements at issue in *Hogan* are readily distinguishable from Bonnie's statements to Megonical and Thacker. Tempel Smith, Sr. hinted at possibly giving an unspecified amount of money to Judge Hogan at an unspecified time in the future. In contrast, on November 29, 1995, Bonnie spent 45 minutes telling Megonical and Thacker that she intended to go home and tell Gray that she wanted a divorce that same evening. Accordingly, Gray's reliance on *Hogan* is misplaced.

Gray also relies on *Hayden v. United States,* 637 F.Supp. 1202 (S.D.N.Y.1986). In that case, Joseph Hayden, Steven Baker, and Steven Monsanto were tried and convicted with eight other defendants, including Leroy Barnes, for violations of various federal narcotics and firearms laws. The jury hung as to another defendant, Guy Fisher. In a subsequent trial of several of the defendants, including Fisher, the State moved for an anonymous jury, claiming that Fisher had tampered with the jury in the previous case. In support, the State offered certain hearsay statements that Fisher had made to Barnes and a confidential informant. Fisher had told Barnes that he intended to "approach" a juror that a friend of his had recognized. Fisher also had told the confidential informant

that his friend had recognized a prospective juror who was an African American woman and worked in a hospital. Fisher then reportedly told the informant that he had paid $25,000 to the prospective juror in exchange for obtaining a hung jury for him. A juror fitting the description provided by Fisher and the confidential informant had been on the jury. According to the confidential informant, the juror left New York shortly after the conclusion of the trial.

Hayden, Baker, and Monsanto petitioned for writs of *habeas corpus* and moved for a new trial, alleging that Fisher had tampered with their jury. During the ensuing discovery, Fisher testified in deposition that he had not tampered with the jury. Discovery produced no evidence other than Fisher's statements to Barnes and the confidential informant to support the claim of jury tampering. Ultimately, the trial court ruled that there was no admissible evidence to prove that Fisher had tampered with the jury and that the only admissible evidence on the issue—Fisher's testimony—indicated that he had not tampered with the jury. On that basis, it denied the petitions and motions for new trial.

Gray asserts that *Hayden* stands for the proposition that a declarant's statement of his then-existing intention to act in the future is not admissible to prove the occurrence of the act without corroborating evidence that the act took place. We disagree, and conclude that *Hayden* is distinguishable from this case. The court in *Hayden* ruled that the statements of then-existing intention, standing alone, were insufficient evidence to establish the ultimate fact of jury tampering. Sufficiency of evidence to prove a fact and admissibility of evidence to prove that fact are not the same thing. As Professor John McCormick has noted:

> The matter of admissibility of declarations of state of mind to prove subsequent conduct is a far different question than of the sufficiency of these statements, standing alone, to support a finding that the conduct occurred.... In the typical case, it is reasonable to hold that declarations are themselves insufficient to support the finding and therefore,

that statements of intention must be admitted in corroboration of other evidence to show the acts.

2 McCormick, *supra*, at 227 (citations omitted).

Under Md. Rule 5–803(b)(3), Bonnie's statements of her then-existing intention to tell Gray that she wanted a divorce were admissible to prove that she did so. That evidence, in turn, was probative of the issue of motive. When considered in tandem with the evidence that Gray had told Fertitta and Raley, at separate times, that he would kill Bonnie if she left him, *see* discussion *infra*, Bonnie's statements were compelling evidence of motive. Moreover, Wathen testified that Gray admitted killing Bonnie because she planned to divorce him. The trial court did not err in ruling that Bonnie's statements of her then-existing intention to tell Gray she planned to divorce him were admissible to prove that she acted on her intention.

### (2)

Fertitta and Raley were called to testify by the State. Gray objected to their testimony about the remarks he had made about Bonnie on the ground that they were too remote in time. The trial court overruled Gray's objections. On appeal, Gray contends that the trial court abused its discretion.

Ordinarily, a party's out-of-court statement is admissible against him if (1) it was made, adopted, or authorized by him or his agent; (2) it is offered in evidence against that party by an opposing party; and (3) it is relevant. Md. Rule 5–803(a)(1). Even if the statement meets these criteria, it nevertheless may be excluded if the matters to which it refers are so remote as to diminish its probative value. *Purviance v. State*, 185 Md. 189, 198, 44 A.2d 474 (1945) ("[T]he trial court may, and sometimes should, reject evidence which, although relevant or deemed to be relevant, appears too remote to be material ...." (citation and internal quotation marks omitted)); *Dobson v. State*, 24 Md.App. 644, 658, 335 A.2d 124 (1975). The trial court should act sparingly in excluding evidence on the basis of remoteness in time, however, because

"remoteness ordinarily affects the weight, rather than the admissibility, of evidence." *Purviance,* 185 Md. at 198, 44 A.2d 474 (citations and internal quotation marks omitted); *Esterline v. State,* 105 Md. 629, 632, 66 A. 269 (1907) (observing that "[n]earness, or remoteness of time, intervening conduct, and the like, will considerably affect [the] weight" of "threats made by the accused, prior to the commission of the alleged offense") (citation and internal quotation marks omitted).

In *Reed v. State,* 68 Md.App. 320, 511 A.2d 567 (1986), we discussed the effect of remoteness in time on the probative value of evidence. In the trial of Gary Reed for the killing of James Middleton, the trial court permitted a witness to testify that, either a year and a half or two years before Middleton was shot, he had seen Reed carrying a handgun. Finding no abuse of discretion, we held:

> The evidence was probative to show that [Reed] possessed the type of weapon employed in killing Middleton. The remoteness of that possession from the date of the homicide went to the weight of that evidence. The court did not abuse its discretion in determining that this evidence was relevant.

*Id.* at 330, 511 A.2d 567 (citing *Brittingham v. State,* 63 Md.App. 164, 182, 492 A.2d 354 (1985)).

Several courts in other jurisdictions also have held it is not a *per se* abuse of discretion to admit evidence of events and statements occurring two years or more before the events at issue. *See, e.g., People v. Barber,* 116 Ill.App.3d 767, 72 Ill.Dec. 472, 452 N.E.2d 725, 732 (1983) (upholding the admission of a threatening letter that the defendant had written to the victim two years before her murder); *State v. White,* 349 N.C. 535, 508 S.E.2d 253, 265 (1998) (upholding the admission of evidence that, two years before the defendant shot the victim, he went to the victim's house, threatened him, and pointed a gun at the victim's head to prove motive and identity); *Elliott v. State,* 600 P.2d 1044, 1048 (Wyo.1979) (upholding the admission of evidence in a sexual assault case that the defendant had assaulted the victim's older sister, even

though the witness's testimony involved incidents occurring up to three years prior to attack on victim); Elaine Marie Tomko, *Admissibility of Evidence of Prior Physical Acts of Spousal Abuse by Defendant Accused of Murdering Spouse or Former Spouse*, 24 A.L.R. 5th 465 (1994) (discussing several cases in which "[e]vidence of prior abusive acts committed by a defendant against a spouse, occurring more than 2 years but less than 3 years before the homicide of the spouse allegedly committed by the defendant, was held by the court not to be so remote as to preclude its admission at the defendant's trial").

■ Gray maintains that the statements in question were made so long before Bonnie's murder that they were without probative value, as a matter of law, or any small measure of probative value they may have had was outweighed by their prejudicial effect, as a matter of law. We disagree. Gray's statement to Raley was made only a few months before Bonnie's disappearance. The statement was a pronouncement by Gray of his intention to kill Bonnie if she left him. While the statement itself preceded Bonnie's death by several months, there was competent evidence introduced at trial showing that on the night before she disappeared Bonnie told Gray that she was leaving him. Thus, the triggering event to which Gray's prior threat applied occurred right before the murder.

■ Likewise, the statement that Gray made to Fertitta constituted a threat to kill Bonnie in the event that "she ever tried taking the house or kid." There were facts in evidence showing that Bonnie intended to seek custody of Becky in a divorce action and that she would have told Gray that when she told him she was leaving. Although Gray's threats as expressed to Fertitta were made about 2½ years before Bonnie's disappearance, they nevertheless were tied to events that occurred right before she disappeared. The probative value of these pieces of evidence was forceful; and given their link in time to events immediately preceding Bonnie's demise, the trial court did not abuse its discretion in ruling them admissible.

Gray cites *Pruitt v. State*, 198 Ind. 141, 152 N.E. 830 (1926), and *Stouffer v. State*, 738 P.2d 1349 (Okla.Crim.1987), to support his argument that Gray's statements to Fertitta were too remote in time to be admissible as a matter of law. In *Pruitt*, Elmer Pruitt shot and killed Oscar Cutsinger because Cutsinger had impounded Pruitt's calf. In defending himself on a charge of first-degree murder, Pruitt argued, *inter alia*, that he had acted out of fear of Cutsinger. He sought to admit evidence that, one year before the shooting, Cutsinger and a man named Durham had threatened him and Durham had fired shots at him; and that the incident had resulted in Cutsinger being convicted of simple assault. The trial court ruled the evidence respecting Cutsinger's actions admissible, but precluded the evidence respecting Durham, on the ground of remoteness. In holding that the trial court had not abused its discretion, the Indiana Supreme Court observed:

The court permitted the defendant and his witnesses to testify fully concerning all that was said and done by Cutsinger at that time and at all times before the fatal shot was fired. But Durham was not shown to have been present when the homicide was committed a year after he had made the remark and fired the shots, nor was it shown that he had anything to do with impounding the calf about which defendant and Cutsinger were quarreling at the time of the homicide, nor anything at all to do with their quarrel at that time or what led up to it.... That shots for which Cutsinger was not shown in any degree to have been responsible were fired by Durham at a time when Cutsinger, himself, did acts which resulted in his being found guilty of a simple assault and fined a dollar, 12 months before the homicide, would not have tended to justify defendant in killing Cutsinger after the lapse of so long a time, in a quarrel with which Durham had nothing to do, and when he was not present.

*Id.* at 832.

Similarly, in *Stouffer v. State, supra,* 738 P.2d 1349, Bigler Jobe Stouffer, II, was charged with murdering Linda Reaves

and shooting Douglas Ivens with intent to kill him. In his defense, Stouffer argued that Douglas Ivens had framed him for the murder and that he had shot Ivens in self-defense. Stouffer attempted to elicit testimony from Ivens' estranged wife, Velva, about Ivens's drinking habits. She could not testify about his drinking habits at the time of the shootings, however, because they had not lived together for 15 months prior to the shootings. The trial court excluded the evidence as being too remote to be probative. The Oklahoma Court of Criminal Appeals upheld the ruling of the trial court:

> We agree with the trial court that Velva Ivens'[s] knowledge was too distant to establish a then current pattern of Ivens'[s] conduct or to be relevant, or to qualify as impeachment evidence. . . . The trial judge may properly limit collateral matters which may be the subject of impeachment.

*Id.* at 1356 (citations omitted).

*Pruitt* and *Stouffer* are unpersuasive for two reasons. First, the fact that the trial courts in those cases did not abuse their discretion in ruling that evidence of acts occurring slightly more than a year before the crimes was inadmissible on the basis of remoteness in time does not mean that any such evidence is *per se* inadmissible or that a ruling admitting such evidence necessarily is an abuse of discretion. Second, unlike the evidence that was excluded in *Pruitt* and *Stouffer,* the evidence of Gray's statements to Raley and Fertitta was tied to the subsequent murder for which he was on trial. The excluded evidence in *Pruitt* concerned an attack on the defendant a year before the murder that was unrelated to the murder and was committed by a person who had no involvement in the murder. Likewise, in *Stouffer,* the excluded evidence of Ivens's drinking habits was never shown to have had any relevance to Stouffer's defense. By contrast, notwithstanding the time interval between Gray's statements to Raley and Fertitta and Bonnie's murder, they were linked, in that the statements were threats by Gray to kill Bonnie upon the happening of an event in the future (her deciding to divorce him) and thus was evidence that that event occurred immediately before Bonnie was killed. The trial court did not abuse

its discretion in allowing Fertitta and Raley to testify about Gray's statements to him.[5]

## III.

## (1)

Gray subpoenaed Gatton to appear and testify as a defense witness. Through counsel, Gatton notified the court that he would invoke his Fifth Amendment privilege against self-incrimination.[6] Pursuant to *Bhagwat v. State*, 338 Md. 263, 658 A.2d 244 (1995), the court then held a hearing, outside the presence of the jury, at which Gatton was sworn and was questioned at length by counsel for Gray. Gatton answered the first two questions, which asked his name and age. He responded to all of the other questions posed by invoking the privilege.[7] When the inquiry was concluded, the trial court heard argument of counsel and ultimately ruled that Gatton had a reasonable and good faith basis for invoking the Fifth Amendment privilege every time he did so. *See Bhagwat*, 338

---

**5.** Gray also cites *People v. Chambers*, 22 Cal.App.2d 687, 72 P.2d 746 (1937), and *People v. Andre*, 185 A.D.2d 276, 585 N.Y.S.2d 792 (1992), in support of his argument. In *Chambers*, the Court held that evidence of a speech made in 1930 was inadmissible as too remote in a trial for criminal syndicalism in 1934. Similarly, in *Andre*, the appellate court held that the trial court had abused its discretion by admitting a witness's testimony that he had accompanied the victim to the defendant's home fifteen years before the victim was killed. Because both of these cases involve time differences of more than the 2½ years that elapsed between Gray's statements to Fertitta and Bonnie's murder, they are unpersuasive.

**6.** The Fifth Amendment, applicable to the states through the Fourteenth Amendment, under *Malloy v. Hogan*, 378 U.S. 1, 3, 84 S.Ct. 1489, 12 L.Ed.2d 653 (1964), provides, in pertinent part: "No person . . . shall be compelled in any criminal proceeding to be a witness against himself ." The privilege has been interpreted to be properly asserted by witnesses and parties in criminal and civil proceedings. *McCarthy v. Arndstein*, 266 U.S. 34, 40, 45 S.Ct. 16, 69 L.Ed. 158 (1924).

**7.** Gatton also invoked Article 22 of the Maryland Declaration of Rights, which provides "[t]hat no man ought to be compelled in any criminal case to be a witness against himself." Generally, that privilege is *in pari materia* with the Fifth Amendment. *Adkins v. State, supra*, 316 Md. at 6–7 n. 5, 557 A.2d 203.

Md. at 272, 658 A.2d 244; *Adkins*, 316 Md. at 6–7, 557 A.2d 203; *Richardson v. State*, 285 Md. 261, 265, 401 A.2d 1021 (1979).

Gray informed the trial court that he intended to call Gatton to the stand to state his name and age and to permit the jury to make a physical comparison of the two. Gray then asked for permission to question Gatton, as he had outside of the jury's presence, so that Gatton either would answer the questions posed or invoke the Fifth Amendment privilege in front of the jury. The court denied this request.

In front of the jury, defense counsel called Gatton to the stand, asked him his name and date of birth, which he answered, and had him stand next to Gray for the purpose of physical comparison.

At the close of the evidence, Gray asked the trial court to give the jury the following instruction: "A witness has a right under the Fifth Amendment to the United States Constitution and Article 22 of the Maryland Declaration of Rights to testify or not to testify fully when called to the witness stand." The trial court declined to so instruct the jury, ruling that because no witness had invoked the Fifth Amendment privilege before the jury, the instruction had not been generated by the evidence.

On appeal, Gray argues that the trial court erred in not permitting him to have Gatton invoke the Fifth Amendment privilege in front of the jury and in not instructing the jury as requested. On the first point, he emphasizes that because the public invocation was sought by the defense, not by the prosecution, and because the defense theory was an "either/or proposition"—either Gray or Gatton, but not both, killed Bonnie—the public invocation would not have been prejudicial to the defense. To the contrary, it would have had an exculpatory effect. He maintains that his Sixth Amendment right to present a full defense and to use compulsory process outweighed any countervailing rights of Gatton or the State, and militated in favor of the court exercising discretion to allow

him to call Gatton to invoke the Fifth Amendment in front of the jury. To the extent that the trial court did not exercise discretion at all in ruling on this issue, it erred; and to the extent that it exercised its discretion to disallow the public invocation, it abused that discretion.

On the second point, Gray argues that the jury instruction he asked for was generated by the evidence and, in the absence of a public invocation of the privilege by Gatton, was necessary to prevent prejudice to the defense. He maintains that because his entire defense hinged on the theory that Gatton was the killer, it was likely that the jury would interpret his unexplained failure to question Gatton once Gatton was on the stand to mean that he had no faith in his own theory of defense. Gray argues that the only way to dispel that notion was for the trial court to tell the jury, by means of an instruction, the reason he was not questioning Gatton about the crime. By refusing to grant the instruction, the trial court was permitting the defense case to be unduly prejudiced.

Three Maryland cases have addressed the propriety *vel non* of the trial court allowing a witness to take the stand in order to invoke the Fifth Amendment privilege in front of the jury. In all three cases, the Court of Appeals held that it was error for the trial court to permit that practice. *See Allen v. State,* 318 Md. 166, 177–80, 567 A.2d 118 (1989) (holding that the trial court erred when it called to the stand a prosecution witness, who had been implicated in the criminal conduct for which the defendant was on trial, as a "court's witness," knowing the witness would claim the privilege); *Adkins,* 316 Md. at 12–16, 557 A.2d 203 (holding that the trial court erred in permitting the prosecution to call to the stand for purposes of publicly invoking the privilege an accomplice of the defendant who had been tried separately, and convicted, but whose conviction was on appeal); *Vandegrift v. State,* 237 Md. 305, 307–10, 206 A.2d 250 (1965) (holding that the trial court erred in allowing the prosecution to call to the stand several alleged accomplices of

the defendant, knowing that they would invoke the privilege).[8]

Gray correctly points out that these cases differ materially from the case *sub judice* in that they address situations in which the prosecution (either directly or through the court), not the defense, sought to have the witness invoke the privilege in front of the jury. In addition, in each case, the witness in question was alleged to have been complicit in the crime for which the defendant was on trial; thus, an adverse inference against the witness invoking the privilege would have had the secondary and highly prejudicial effect of implicating the defendant. Gray asserts that in this case, by contrast, prejudice to the defense was not an issue. To the extent that the jury would have drawn an adverse inference against Gatton from his claim of privilege, that inference would have tended to exonerate, not implicate, Gray; indeed, for that very reason, Gray considered the inference against Gatton a critical item of evidence in his defense.

Several courts in other jurisdictions have addressed the question of whether a trial court has discretion to allow a criminal defendant to call a witness to the stand for the purpose of having the witness invoke the privilege before the jury. Although the courts are divided in the approaches they take to this issue, they are united in their disapproval of the practice. Some courts have held that such a practice is strictly prohibited and that trial courts have no discretion to permit it. Other courts have held that it is within a trial court's discretion to permit the practice; among those courts, however, the cases approving the practice in a given situation are rare. One author has described the issue, and the reaction of the courts to it, as follows:

---

**8.** In *Bhagwat v. State,* which did not involve that issue, but addressed the proper procedure for the trial court to follow in determining whether a witness properly could invoke the Fifth Amendment privilege, the Court commented that the inquiry that is to be conducted once there has been a clear indication on the record that the witness intends to invoke the privilege "should not occur in front of the jury. This is so because of the potential for prejudice that this presents." *Bhagwat,* 338 Md. at 273 n. 11, 658 A.2d 244.

May a defendant who professes a need for a witness' testimony that is unavailable because of the witness' use of the [Fifth Amendment] privilege nevertheless call the witness and compel him to invoke his privilege before the jury? This, of course, creates no danger to the defendant's right of confrontation and cross-examination. But it may infringe on whatever similar interests are held by the prosecution. It also, on the other hand, may involve defendants' interest in having maximum possible opportunity to use available witnesses, an interest to some extent embodied in their right of compulsory process. In general, courts have been hostile to efforts of this sort.

John McCormick, *Evidence,* § 121, at 297 (1984) (footnote omitted).

The seminal case on this issue is *Bowles v. United States,* 439 F.2d 536 (D.C.Cir.1970) (en banc). Bowles was convicted of first degree murder and assault with intent to rob in the stabbing death of a soldier. The main evidence against him was the testimony of a witness who claimed to have overheard Bowles tell his mother that he had killed the soldier. Bowles's theory of defense was that the crime had been committed by one Raymond Smith, and that he had had nothing to do with it. There was no suggestion in the evidence that Smith and Bowles together had killed the soldier. Jerry Neely, a defense witness, testified that Smith had told him that he (Smith) had killed the soldier. When Bowles sought to call Smith to the stand to testify, however, Smith informed the court that he would claim the Fifth Amendment privilege. Bowles then sought permission to call Smith to the stand for the purpose of invoking the privilege in front of the jury. He argued that his Sixth Amendment right to compulsory process included the right to compel Smith to appear before the jury, either to testify or to claim the testimonial privilege. The trial court denied Bowles's request.

The United States Court of Appeals for the District of Columbia affirmed, holding that calling a witness to the stand so that he will invoke the Fifth Amendment privilege in front of the jury is strictly prohibited. The court reasoned that the

practice is not allowed because the act of asserting the Fifth Amendment privilege is devoid of evidentiary value: "[T]he jury is not entitled to draw any inferences from the decision of a witness to exercise his constitutional privilege whether those inferences be favorable to the prosecution or defense." *Id.* at 542 (citing *Billeci v. United States,* 184 F.2d 394 (D.C.Cir. 1950)). The court went on to observe that to jurors, the spectacle of having a witness "take the Fifth" is "high court-room drama." *Id.* By disallowing that practice, the trial court ensures that the jury will not react to the "drama" by giving weight to what is essentially valueless "evidence." *Id.* at 542. The court noted that the risk that the jury would put undo emphasis on a witness's act of invoking the Fifth Amendment is especially great given that the witness is not subject to cross-examination and need not justify, at least to the jurors, the grounds for the claim of privilege. *Id.* (citing *Fletcher v. United States,* 332 F.2d 724 (D.C.Cir.1964)). The court concluded that "a witness should not be put on the stand for the purpose of having him exercise his privilege before the jury. . . . This would only invite the jury to make an improper inference." *Id.* (citation omitted). It added, however, that the trial court "could properly have given a neutralizing instruction, one calculated to reduce the danger that the jury will in fact draw an inference from the absence of such a witness." *Id.* Bowles had not requested such an instruction.

Chief Judge Bazelon dissented. He observed that Bowles's defense that Smith, not he, had killed the soldier was supported by other witnesses, so there was no reason to think that Bowles was "fabricating a story and then [was] buttressing it with Smith's refusal to testify." *Id.* at 544 (Bazelon, J., dissenting). He also pointed out that in the eyes of the jurors, Bowles's failure to call Smith to testify "could not help but make much less credible Bowles'[s] protestations of innocence"; moreover, if called to testify, Smith may have decided not to claim the privilege. *Id.* at 544 (Bazelon, J., dissenting). Ultimately, Judge Bazelon concluded that the majority was unnecessarily deciding the question whether all inferences based on a refusal to testify are improper because, in his view,

the trial court had committed plain error by failing to instruct the jury, in neutral terms, that no inference could be drawn from Smith's absence from the witness stand. *Id.* at 544–46 (Bazelon, J., dissenting).

Generally speaking, the courts that have held that the practice of calling a witness before the jury, knowing that he will invoke the Fifth Amendment privilege, is strictly prohibited, even when it is the defense that seeks to do so, have relied on the majority opinion in *Bowles* and have reasoned, as did that court, that the invocation of the privilege simply lacks probative value. *State v. Hughes,* 328 S.C. 146, 493 S.E.2d 821 (1997); *People v. Cudjo,* 6 Cal.4th 585, 25 Cal.Rptr.2d 390, 863 P.2d 635, 658 (1993); *People v. Dikeman,* 192 Colo. 1, 555 P.2d 519, 520–21 (1976); *People v. Myers,* 35 Ill.2d 311, 220 N.E.2d 297, 310–11; *State v. Berry,* 324 So.2d 822, 829–30 (La.1975); *State v. Nunez,* 209 N.J.Super. 127, 506 A.2d 1295, 1298 (A.D.1986); *Commonwealth v. Greene,* 445 Pa. 228, 285 A.2d 865, 867 (1971); *Horner v. State,* 508 S.W.2d 371, 372 (Tex.Cr.App.1974); *State v. Hughes,* 328 S.C. 146, 493 S.E.2d 821, 823–25 (S.C.1997). On the other hand, a number of courts have recognized that when prejudice to the defendant is not an issue, the trial court has discretion to permit the otherwise prohibited practice. *See United States v. Bowman,* 636 F.2d 1003, 1013–14 (5th Cir.1981); *United States v. Martin,* 526 F.2d 485, 486–87 (10th Cir.1975); *United States v. Lacouture,* 495 F.2d 1237, 1240–41 (5th Cir.1974); *United States v. Johnson,* 488 F.2d 1206, 1211 (1st Cir.1973); *People v. Dyer,* 425 Mich. 572, 390 N.W.2d 645, 650–51 (1986); *State v. Berry,* 658 S.W.2d 476, 479–80 (Mo.App.1983); *People v. Thomas,* 51 N.Y.2d 466, 434 N.Y.S.2d 941, 415 N.E.2d 931, 934–35 (1980); *Porth v. State,* 868 P.2d 236, 239–41 (Wyo. 1994); see also 5 Lynn McLain, *Maryland Evidence: State and Federal,* § 514.4, at 627 (1987) (observing that the decision to allow a witness to invoke the Fifth Amendment before the jury lies within the court's discretion).

To support his argument that the trial court erred either by failing to exercise discretion to permit him to ask Gatton questions for the purpose of having him claim the privilege

before the jury, or in exercising discretion to disallow the request, Gray relies on a concurring opinion in *People v. Dyer, supra;* two Arizona Supreme Court cases; a line of New York cases, including *People v. Thomas, supra;* an Alabama appellate case; and a law review article. None of these authorities persuades us that the trial court committed error in this case.

In *People v. Dyer, supra,* 425 Mich. 572, 390 N.W.2d 645, the Michigan Supreme Court affirmed a trial court's decision not to allow a defendant to call a witness to the stand to invoke the Fifth Amendment privilege before the jury. The defendant was on trial for carrying a concealed weapon. He and two friends were standing on a street corner when they were approached by a policeman. The defendant dropped a handgun on the ground. He claimed that the gun had been dropped by one of the other men and sought to have that man testify at trial. When the man indicated that he would claim the privilege, the trial court refused to allow the defendant to call him to have him invoke the privilege before the jury. On appeal, the intermediate appellant court reversed the conviction, on the ground that the ruling was in error. The Michigan Supreme Court in turn reversed, holding that the trial court did not err:

> Placing [the witness] on the stand to invoke his Fifth Amendment privilege may have allowed the jury to infer that [the witness,] not defendant, was guilty of the present charge. However ... this procedure would produce no "substantial evidence." A witness who exercises his Fifth Amendment right is not confessing or admitting guilt. Therefore, no inferences may be drawn from his refusal to testify.

*Id.* at 649 (citation omitted). The concurring opinion observed that the prosecution and the defense are not on equal footing in these situations, because the prosecution has the option of granting the witness immunity, and suggested that in the appropriate case, when the issue has been preserved, the court address whether a defendant has a right to witness immunity. This is of no help to Gray, as the issue of witness immunity has not been raised on appeal.

Also unavailing to Gray are *People v. Thomas, supra,* 51 N.Y.2d 466, 434 N.Y.S.2d 941, 415 N.E.2d 931, and two additional New York cases that he cites. *See People v. Sapia,* 41 N.Y.2d 160, 391 N.Y.S.2d 93, 359 N.E.2d 688 (1976), and *People v. Patrk,* 191 A.D.2d 718, 595 N.Y.S.2d 798 (1993). To be sure, those cases reject a flat prohibition against allowing a defendant to call a witness for the purpose of having him exercise the Fifth Amendment privilege before the jury. In all three cases, however, the courts affirmed a trial court's exercise of discretion to disallow the practice in the case before it. Interestingly, the reasons given by the Court of Appeals of New York in doing so echo the majority opinion in *Bowles:*

> [A] witness' refusal to testify on constitutional grounds does not, in and of itself, have any real probative significance, although it may have a disproportionate impact upon the minds of the jurors and may tend to create the impression that the witness is guilty of a particular crime.... In the context of the instant case, for example, there existed a very real danger that the jury would infer from [the witness's] refusal to testify that defendant's contention was correct and that it was [the witness] rather than the defendant who had actually committed the [robbery]. Yet, such an inference would clearly have been unwarranted, since [the witness's] refusal to testify could have been based upon considerations wholly unrelated to the crime at issue in the instant trial.

*Thomas,* 434 N.Y.S.2d 941, 415 N.E.2d at 934.

The Arizona Supreme Court cases that Gray cites, *State v. Encinas,* 132 Ariz. 493, 647 P.2d 624 (1982), and *State v. Gretzler,* 126 Ariz. 60, 612 P.2d 1023 (1980), subsequently were overruled by *State v. McDaniel,* 136 Ariz. 188, 665 P.2d 70 (1983), in which the court affirmed the trial court's refusal to allow the defendant to call to the witness stand two men that he contended had committed the crime for which he was being tried, even though he knew they were going to invoke the Fifth Amendment privilege. The court rejected the defendant's argument that his Sixth Amendment right to compulso-

ry process entitled him to have the witnesses appear and invoke the privilege in front of the jury. Observing that a defendant must make " 'some showing that the evidence lost would be both favorable and material to the defense' " to establish a violation of the Sixth Amendment right to compulsory process, the court held that because a jury in a criminal case is not permitted to draw an inference from a witness's exercise of his Fifth Amendment privilege, a defendant does not lose favorable and material evidence when a trial court rules that he may not call a witness to invoke the privilege before the jury. *McDaniel,* 665 P.2d at 76–77 (quoting *United States v. Valenzuela Bernal,* 458 U.S. 858, 873, 102 S.Ct. 3440, 73 L.Ed.2d 1193 (1982)).

The Alabama case that Gray cites is the only one we have found reversing a trial court's ruling prohibiting a defendant from calling a witness to invoke the Fifth Amendment privilege in front of the jury. In *Matthews v. State,* 611 So.2d 1207 (Ala.Crim.App.1992), the defendant was convicted of murder. Two police officers on patrol saw him and two other men approach the victim, who was sitting in a parked truck. A shot rang out and the three men fled. The defendant admitted holding the gun that fired the shots, but claimed that the weapon had discharged accidentally. At trial, he sought to call one of the other men who had been present at the scene to corroborate his story. After the trial court advised him of his Fifth Amendment rights and appointed counsel for him, the man informed the court that he would claim the privilege. The trial court ruled that because the " 'jury can draw no inference whatsoever' " from the invocation of the privilege, it would be inappropriate to have the witness take the stand for the sole purpose of making the invocation. *Id.* at 1211.

On appeal, the defendant argued that "his right to have a key witness testify in his behalf far outweigh[ed] the witness's right against self-incrimination." *Id.* at 1208. The Alabama appellate court stated that it agreed, holding that the trial court had erred by failing to require the witness to take the stand:

While it is abundantly clear that a witness has the right to invoke the Fifth Amendment and refuse to testify, the witness must take the stand and have the questions posed before the Fifth Amendment can be invoked. In this case, the trial court should have required the witness to take the stand and have a question asked of him before it permitted the witness to invoke the Fifth Amendment privilege against self-incrimination.

*Id.* at 1212.

*Matthews* is unpersuasive. Unlike all of the other cases addressing the propriety *vel non* of a trial court permitting a defense witness to take the stand to invoke the Fifth Amendment privilege, the court in *Matthews* held that notwithstanding the lack of evidentiary value in the act of claiming the privilege, the trial court had no discretion to allow the witness to invoke the privilege other than in the presence of the jury. This holding is flatly contrary to our Court of Appeals's holding in *Bhagwat v. State, supra,* 338 Md. 263, 658 A.2d 244, and other authorities holding that, when a witness intends to assert the privilege in response to essentially all questions, the court has discretion to allow him to refuse to take the stand. *See e.g., United States v. Kaplan,* 832 F.2d 676, 684 (1st Cir.1987) (citations omitted); *United States v. Reese,* 561 F.2d 894, 899 (D.C.Cir.1977).

The law review article that is the centerpiece of Gray's argument advocates the view that in a "single-culprit crime," when the defendant is unable to force the State to grant immunity to the witness he contends is the true culprit, the jury should be permitted to watch the witness invoke the privilege if the probative value of public invocation would outweigh its prejudicial impact. Peter W. Tague, *The Fifth Amendment: If an Aid to the Guilty Defendant, an Impediment to the Innocent One,* 78 Geo. L.J. 1 (1989). The author takes issue with the notion that the act of invoking the privilege has no evidentiary value whatsoever, pointing out that an adverse inference may be drawn against a party in a civil case. He argues in addition that the invocation meets the definition of "relevant evidence" in FRE 401, in that it is

"evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." *See also* Md. Rule 5–401. He maintains, moreover, that even if the invocation is not technically "evidence," it has value in that it tends to enhance the significance of the evidence that the witness, by invoking the privilege, does not counter. *Id.* at 15.

In *Baxter v. Palmigiano*, 425 U.S. 308, 318, 96 S.Ct. 1551, 47 L.Ed.2d 810 (1976), the Supreme Court held that "the Fifth Amendment does not forbid adverse inferences against parties to civil actions when they refuse to testify in response to probative evidence offered against them." In *Kramer v. Levitt*, 79 Md.App. 575, 558 A.2d 760 (1989), we addressed the evidentiary significance of a party's invoking the Fifth Amendment privilege in a civil case, in response to discovery requests. We read *Baxter* to mean that three criteria must be met before an inference may be drawn against a person exercising his Fifth Amendment privilege: 1) the action must be a civil case; 2) the party seeking to draw the inference must have made out a *prima facie* case, so that he is not relying on the adverse inference to establish an element of his cause of action; and 3) the person invoking the privilege must be a party, not a witness. *Id.* at 586. On that basis, we held that party who had asserted the privilege in response to discovery could not testify on the same topic at trial and that the opposing party was entitled to an instruction telling the jurors that they could, but need not, draw an inference from the party's invocation of the Fifth Amendment privilege that his answers to the discovery requests would have been adverse to his interests. *Id.* at 56–89.

Given that when it is asserted in a civil case, by a party, the Fifth Amendment privilege may take on evidentiary significance, we disagree with the courts that take the sweeping view that there can never be probative value to a witness's assertion of the privilege in a criminal case and, therefore, trial courts lack discretion to permit a witness to take the

stand when it is known that the witness will invoke the privilege. The question is not whether a witness's assertion of the privilege is devoid of evidentiary value in a criminal case but whether, as a matter of policy, a trier of fact in a criminal case should be permitted to give that act evidentiary value and, if so, under what circumstances. We agree with the courts that, mindful that the defendant's Sixth Amendment rights may be implicated, recognize discretion in the trial court to decide the issue based on considerations of relevancy and probative value versus potential prejudicial effect. Thus, in Maryland, the question whether, upon request of a criminal defendant, a witness may be questioned in front of the jury when it is known that he will reasonably and in good faith assert the testimonial privilege must be determined by application of Md. Rules 5–401 and 5–403.

That having been said, however, we also agree that it would be a rare circumstance in which a court could soundly exercise its discretion to allow a defendant to call a witness that he knows will invoke the privilege in front of the jury. We conclude, furthermore, that in the case *sub judice*, whether the trial court exercised its discretion in this regard matters not. The state of the evidence and the circumstances of the case were such that the trial court could not have exercised sound discretion to permit Gray to call Gatton to the witness stand for questioning, so as to have him assert the privilege in front of the jury. Whatever questionable probative value there was in having Gatton assert the privilege in front of the jury was entirely outweighed by the substantial danger of unfair prejudice that would have resulted. We explain.

*Baxter* teaches that, even when an adverse inference is permitted against a party in a civil case, it may not be used as a substitute for affirmative proof of facts necessary to establish a cause of action. To be sure, a criminal defendant need not present proof of any facts whatsoever. When he chooses to put on a defense that casts blame on another person, however, he should not be permitted to construct a

scenario of criminal wrongdoing by that person based solely upon adverse inferences drawn from the person's assertion of the Fifth Amendment privilege.

In the case at bar, Gray was attempting to do just that. The evidence that he presented to show that Gatton had murdered Bonnie was at best thin (which probably explains why the State had chosen to prosecute him, not Gatton). It consisted of witness testimony that, in the fall of 1995, Gatton was seen with Bonnie, called her his girlfriend, and was jealous toward her; that shortly after Bonnie's disappearance, Gatton was in his truck and panicked when he encountered some police officers and later sold the truck and gave away some of his knives; and that after Bonnie's death, Gatton was seen in possession of some items of jewelry belonging to her. Gray had no evidence connecting Gatton to the murder scene or to the crime itself, or establishing that Gatton was involved in any events leading up to the murder. Nevertheless, the questions that Gray posed to Gatton outside of the jury's presence and that he sought to have Gatton "answer" by asserting the privilege in front of the jury were leading, narrative statements designed to supply a motive for Gatton committing the crime and to paint a detailed picture of the actions Gatton would have taken *if* he had committed the crime. For example:

> On the morning of November 30 of 95 when Bonnie Gray was dressed and going to work did you in some way stop her or intercept her car at that time?
>
> What was the reason for any argument with Bonnie Gray on November 30, 1995?
>
> Was your argument with Bonnie Gray in the area of a decision by her not to be with you and to be with her husband?
>
> Did you kill Bonnie Gray because she didn't want to go with you and did not want to leave her husband?
>
> \* \* \* \*
>
> Did you dispose of Bonnie Gray's eye glasses after she was murdered?

Who put her in the trunk of the car of her Intrepid? Did you?

\* \* \* \* \*

Look at all of the photographs of Bonnie Gray and parts of her body and tell me if you inflicted any of those wounds to her?

An examination of this sort, being a litany of alleged events peppered with assertions of the privilege in response, is tantamount to "defense counsel becom[ing], in effect, an unsworn witness for his client." *People v. Thomas,* 68 A.D.2d 450, 417 N.Y.S.2d 278, 281–82 (N.Y.A.D.1979), *aff'd,* 51 N.Y.2d 466, 434 N.Y.S.2d 941, 415 N.E.2d 931. In the absence of a requirement for corroborating evidence, there would be nothing to prevent a defendant from using a witness's claim of privilege to fabricate, down to minute detail, a wholly speculative explanation for the crime that exculpated him completely, offered up another culprit, and could be tested by cross-examination. Gray had no such corroborating evidence for the vast majority of questions he sought to ask. Thus, not only was Gray seeking to use Gatton's presence on the stand to turn speculation about what might have occurred into evidence that it did, he was attempting to do so in a way that, as other courts have observed, jurors would overemphasize because they would see it as "high courtroom drama." *Lacouture,* 495 F.2d at 1240; *Bowles,* 439 F.2d at 542.

There were other reasons that militated against Gray's request. Gray's own theory of defense—that Gatton killed Bonnie because he was romantically involved with her and she had spurned him—demonstrated that Gray would be motivated to blame Gatton for Bonnie's murder, out of vengeance, notwithstanding that Gray committed the murder himself, and would target him for that purpose. Given that witnesses are granted substantial leeway in invoking their Fifth Amendment privilege, and that Gatton, who, as the trial court put it, either was taking drugs or finding a way to get them, had a host of reasons having nothing to do with this case to assert the privilege, Gray easily could have anticipated that he would do

so and fashioned his defense with that in mind. Under the circumstances, virtually no meaning could be ascribed to Gatton's invoking the privilege. Alternatively, there was no assurance that there was no collusive effort between Gray and Gatton.

In short, the adverse inferences of particularized but unverified facts that Gray sought to introduce by having Gatton assert the Fifth Amendment privilege in front of the jury had dubious probative value, if any, could well have been the product of a plan to seek revenge or of collusion, and would have been highly prejudicial to the State, in that they could not have been tested by cross-examination and probably would have been overemphasized by the jury for reasons having nothing to do with their value. For that reason, the trial court did not err in ruling that Gray could not put Gatton on the stand to invoke the privilege before the jury.

As we have indicated, the court in *Bowles v. United States, supra,* 439 F.2d 536 also addressed the question whether, when the witness that the defendant claims committed the crime has asserted the privilege and has not appeared before the jury, the trial court should instruct the jury about the reason the witness has not appeared, so as to avoid potential prejudice to the defendant from the jury drawing the adverse inference that the defendant did not call the witness to testify because he did not have enough confidence in his theory of defense to do so. As we noted earlier, the court explained that "[t]he trial judge could properly have given a neutralizing instruction, one calculated to reduce the danger that the jury will in fact draw an inference from the absence of such a witness." *Id.* at 542.

For the same reasons that the witness is not invoking the Fifth Amendment privilege in front of the jury, the neutralizing instruction should not inform the jury that the witness did not appear to testify because he invoked the Fifth Amendment privilege. In *People v. Thomas, supra,* 51 N.Y.2d 466, 434 N.Y.S.2d 941, 415 N.E.2d 931, the Court of Appeals of New York explained:

[T]here was no error in the trial court's denial of defense counsel's request for an instruction advising the jury that the witness ... had elected to invoke the constitutional privilege.... In making [this] request[ ], defendant was, in essence, attempting to accomplish indirectly that which we have already concluded could not be accomplished directly. Since the invitation to the jury to engage in unwarranted speculation exists whether the jury is informed of a witness' refusal to testify by the Trial Judge or by the witness himself, we cannot say that it was error for the trial court in this case to reject defendant's request[ ] for an explanatory instruction.

*Id.* at 934. Rather, the instruction should tell the jury "that for reasons developed out of their presence, the witness is not available to either side and they should draw no inference from the witness' nonappearance." McCormick, *supra,* § 121, at 297–98 (citations omitted).

 "A neutralizing instruction, while not mandatory, should be given when properly requested by either party in order to avoid unfair prejudice and to aid in trial strategy." *Id.* at 651, 434 N.Y.S.2d 941, 415 N.E.2d 931. In the case *sub judice,* Gray could have requested a neutralizing instruction by which the jurors would have been told that Gatton was not available to either side to answer any further questions and that they were not to draw any inference from that situation. With respect to instructing the jury, the fact that Gatton appeared and testified on a limited basis does not distinguish this case from those in which the witness did not appear before the jury at all. Gray did not seek a neutralizing instruction, however. Rather, he sought an instruction that would have informed the jurors that, "[a] witness has a right under the Fifth Amendment to the United States Constitution and Article 22 of the Maryland Declaration of Rights to testify or not to testify fully when called to the witness stand." For the reasons we have explained, the trial court properly declined to so instruct the jury.

### (2)

Before Wathen was cross-examined by the defense, the trial court conducted a hearing, outside the presence of the jury, to decide whether Gray could use evidence of several robbery and daytime housebreaking charges pending against Wathen for impeachment. Wathen's counsel informed the court that if questioned about those charges, Wathen would assert his Fifth Amendment privilege. The court ruled that Wathen had a reasonable and good faith basis for doing so. Gray then asked the court to permit him to question Wathen about the charges before the jury so as to have Wathen claim the privilege in the jury's presence. The trial court weighed Gray's Sixth Amendment right of confrontation against Wathen's Fifth Amendment right, and ruled against Gray on that point. Specifically, the court reasoned that because Wathen had been convicted of several other offenses that Gray could use for impeachment, and Gray's only purpose in seeking to have Wathen assert the privilege in front of the jury was impeachment, there was no infringement of Gray's right of confrontation. The trial court did not abuse its discretion in so concluding.

## IV.

### (1)

Donald Hooper, Sr., was called as a defense witness. Hooper was the person from whom Gray had learned that the police had located Bonnie's car. Hooper testified that he had told Gray that the police had found Bonnie's car, but could not get into the trunk, and that Gray had reacted to that information by becoming upset.

Detective Eric DeStefano testified in the State's rebuttal case. He said that he had interviewed Hooper on February 11, 1997, and that Hooper had told him that Gray had displayed little to no emotional reaction upon being told that the police had found Bonnie's car. Detective DeStefano further testified that Hooper had told him that he had offered to take Gray to the location of the car, but that Gray had said no;

instead, Gray had asked Hooper to go himself, to find out what the police knew, and to return if the police needed a key to open the trunk of the car.

On cross-examination, Gray asked Detective DeStefano whether in the interview Hooper had told him that Gray and his family had cried when they learned that Bonnie's body had been found in the trunk of her car. (The detective's report stated that Hooper had said as much.) The State objected, arguing that the question was beyond the scope of direct. The trial court sustained the State's objection.

Becky Gray also testified for the defense. She stated that on the evening of November 29, 1995—the day before Bonnie disappeared—she and Bonnie had baked a cake for Gray's birthday, which was the following day. Becky further testified that, on the morning of November 30, 1995, she had seen Bonnie getting dressed in the master bedroom while Gray slept. Becky and Bonnie then had a snack in the kitchen. Afterward, Becky watched Bonnie get into her car and drive away.

In the State's rebuttal case, Corporal Sheila Welling testified that she had spoken to Becky twice on December 8, 1995, and that, in those conversations, Becky could not identify the day of the week that she last had seen Bonnie or say when that day was in relation to her father's birthday, and Becky did not mention anything about baking a birthday cake.

On cross-examination of Corporal Welling, Gray attempted to elicit other statements that Becky had made to her on December 8, 1995, concerning the activities of the morning of November 30, 1995. Those statements were consistent with Becky's trial testimony, but did not concern the actual date on which Becky had last seen Bonnie or whether Bonnie and Becky had baked a birthday cake. The trial court ruled that the prior consistent statements in the report were beyond the scope of the State's direct examination and were inadmissible.

Gray contends that the trial court abused its discretion in ruling inadmissible the prior consistent statements by Hooper and Becky. He argues that those statements were admissible

for rehabilitation of Hooper and Becky, under Md. Rule 5–616(c)(2).

Md. Rule 5–616(c)(2) provides: "A witness whose credibility has been attacked may be rehabilitated by . . . evidence of the witness' prior statements that are consistent with the witness's present testimony, when their having been made detracts from the impeachment." In *Holmes v. State*, 350 Md. 412, 427, 712 A.2d 554 (1998), the Court explained: "[A] prior consistent statement is admissible to rehabilitate a witness as long as the fact that the witness has made a consistent statement detracts from the impeachment."

■ The trial court did not abuse its discretion in ruling the proffered prior consistent statements inadmissible. The State had impeached Hooper by asking Detective DeStefano about Hooper's statements about Gray's initial emotional reaction to the police's discovery of Bonnie's car. On cross-examination of Detective DeStefano, Gray did not attempt to rehabilitate Hooper with a prior consistent statement by Hooper on that point. Rather, the prior consistent statement he sought to use for that purpose concerned Gray's emotional reaction to learning of Bonnie's death at a later time. Likewise, in cross-examining Corporal Welling, Gray was seeking to rehabilitate Becky with prior statements by her that, while consistent with some portions of her testimony, did not address the particular aspect of her testimony that had been impeached. In both instances, the trial court properly concluded that the fact that the witnesses had made the prior consistent statements Gray sought to introduce did not detract from their impeachment, because the topic of impeachment and the topic of the statement were not the same.

## (2)

In its rebuttal case, the State recalled Thacker and Megonical, each of whom testified that on the morning of December 1, 1995, Becky told them that on the night of November 29, Bonnie had made dinner, eaten dinner with her, washed the dishes, bathed her, and read to her, and that Becky and

Bonnie had gone to sleep after the reading session. Thacker and Megonical each testified that Becky made no mention in her December 1 conversation of a birthday cake or of seeing Bonnie on the morning of November 30.

On surrebuttal, Gray sought to introduce statements that Becky made in February 1998, shortly before the trial, to Gray's brother and sister-in-law, that she had baked a cake with Bonnie on November 29, 1995, and that she had seen Bonnie leave the house on November 30, 1995. The State argued these statements were inadmissible because, when Becky made them, she had a motive to falsify. The trial court sustained the objection.

On appeal, Gray contends that the trial court abused its discretion by excluding these statements.

A prior consistent statement offered to rehabilitate a witness's credibility need not have pre-dated the inconsistent statement. *Holmes,* 350 Md. at 429–30, 712 A.2d 554. Nevertheless, "where the credibility of the witness has been impeached in such a way as to indicate that his present testimony may be a fabrication, prior consistent statements are admissible for rehabilitative purposes if they would tend to show that such consistency was present prior to the time of probable fabrication." *Krouse v. Krouse,* 94 Md.App. 369, 387 n. 9, 617 A.2d 1098 (1993) (citing *Finke v. State,* 56 Md.App. 450, 492, 468 A.2d 353 (1982) (citation omitted); *Collins v. State,* 318 Md. 269, 285–86, 568 A.2d 1 (1990)). As explained by one commentator:

> Subsection (c)(2) [of Md. Rule 5–616] incorporates the logical requirement of the better reasoned Maryland cases, that, in order for a prior consistent statement to be admissible to rehabilitate a witness, the fact that the witness made the statement at the time he or she did must detract from the impeachment. *See, e.g., American Stores Co. v. Herman,* 166 Md. 312, 316, 171 A. 54 (1934).
>
> For example, suppose that a witness testifies at trial that the light was red for the defendant, and is impeached by her deposition testimony given one year earlier, that the light

was green for the defendant. If the plaintiff offers to prove the witness's statement, made one week before trial, that the light was red, the evidence should be excluded. If, however, the consistent statement was made soon after the accident and before the deposition (or even, perhaps, soon after the deposition but long before trial), the statement should be admitted.

McLain, *supra,* § 2.616.4(d), at 184.

Gray relies heavily on *Holmes v. State, supra,* 350 Md. 412, 712 A.2d 554, to argue that the trial court committed reversible error. In *Holmes,* a State's witness initially told the police that she did not know who killed the victim. Two days later, in a second statement to the police, the witness identified the defendant as the person who had shot the victim. The witness explained that she had not leveled with the police at first because she had feared for her safety. At trial, the defense used the witness's first statement to the police to impeach her. Over objection, the trial court permitted the State to use the witness's second statement to rehabilitate her credibility. On appeal, the Court of Appeals ruled that the trial had acted properly, noting:

> Under Md. Rule 5–616(c)(2), a prior consistent statement is admissible to rehabilitate a witness as long as the fact that the witness has made a consistent statement detracts from the impeachment. . . . [Prior consistent statements] are relevant because the circumstances under which they are made rebut an attack on the witness's credibility. . . .

> [T]he State had a right to rehabilitate [the witness] with her prior consistent statement. [The witness's] consistent statement detracted from the impeachment by rebutting her initial inconsistent statement to police that she did not see who shot [the victim.] It also put in perspective that her inconsistent statement was made because she was frightened of what [the defendant] would do to her. [The witness's] consistent statement therefore detracted from the impeachment by [the witness's] inconsistent statement that

was elicited by defense counsel and was admissible for rehabilitative purposes under Md. Rule 5–616(c)(2).

*Id.* at 427–28, 712 A.2d 554.

The instant case is distinguishable from *Holmes.* In *Holmes,* the witness's prior consistent statement was made two days after her inconsistent statement and explained the reason why the statements were different and, ultimately, why the second statement was consistent with her trial testimony. Moreover, the witness had no motive to fabricate her testimony. In the case *sub judice,* Becky made the statements that were consistent with her trial testimony more than two years after her prior inconsistent statements. The subsequent statements did nothing to explain the inconsistency and by the time they were made, Becky had a motive to falsify, in that her father was facing trial for murder. Furthermore, the fact that the statements were made to Gray's relatives, who testified on his behalf, increased the likelihood that they were fabrications offered to bolster Becky's trial testimony. The trial court did not err in ruling them inadmissible.

**JUDGMENT AFFIRMED. COSTS TO BE PAID BY APPELLANT.**